PEOPLE *v.* COLLINS.

144 - 121
f156  ²375

1. Criminal Law — Trial — Reception of Evidence — Offer of Immaterial Matter—Prejudice.

Where, on a trial for murder, respondent on cross-examination denies having stolen certain goods from a store and afterwards paying for them when presented with a bill for them, it is prejudicial for the prosecuting attorney to produce the merchant with his books to contradict her and argue the admissibility of the contradiction before the jury, though the evidence is not admitted.

2. Homicide—Evidence—Other Homicide—Admissibility.

On a trial for murder by poisoning with arsenic, it is prejudicial error to admit evidence to show the presence of arsenic in the body of another member of respondent's household who died some months before the person alleged to have been murdered, it being expressly disclaimed that there was a

common scheme or plan embracing the killing of both persons, and the jury being instructed that the only purpose of the evidence was to show the presence of arsenic in the house.

GRANT and MONTGOMERY, JJ., dissenting.

Error to Shiawassee; Smith, J. Submitted November 16, 1905. (Docket No. 236.) Decided May 24, 1906.

Carrie Collins was convicted of murder in the first degree and sentenced to imprisonment for life in the State prison at Jackson. Reversed, and new trial ordered.

*John T. McCurdy*, for appellant.

*Charles M. Hamper*, Prosecuting Attorney, for the people.

OSTRANDER, J. It was not supposed that Leachman, whom it is charged respondent murdered, died from other than natural causes. He was attended by a physician from October 14th until October 23d, when he died. A post-mortem examination was had, not because it was suspected that he had been poisoned, but to learn the extent of certain bodily injuries received by him at the hands of other men shortly before he became ill. Both the ante-mortem and the post-mortem evidence indicated death from pneumonia. His attending physician, who assisted at the autopsy, certified that the cause of his death was double pneumonia. He so testified at the preliminary examination in this case, although at that time he knew it was claimed that the chemist had found arsenic in the organs sent him for examination. At the trial, upon cross-examination, he gave the following testimony:

"I also testified at the preliminary examination, the same as I have here, that there was nothing in Leachman's general appearance, from my clinical knowledge or history of the case, during the time I was treating him, from the 16th day of October up until the time of his death, that caused me to treat him for arsenical poisoning.

I also testified that from the time the first indication of pneumonia appeared there was no evidence of arsenical poisoning, and I didn't treat him for any. And I say so now. I think; if pneumonia hadn't set in, Leachman would have recovered."

Five other physicians, one of whom had been attending Leachman and was present at the autopsy, called by the prosecution, gave testimony supporting the views and conclusions of the attending physician and affirming that if no arsenic had been found in the stomach of Leachman by the chemist, death must be attributed to pneumonia and gastritis. The post-mortem discovered three-fourths of both lungs in a state of red hepatization and engorged, the posterior and base quite solid; impossible for oxygen to circulate; no condition of any of the organs which might not be attributed, properly, to gastritis and pneumonia; the heart, kidneys, and liver normal. The attending physician gave, also, this testimony :

" *Q.* Wouldn't all of his ante-mortem symptoms and port-mortem conditions be consistent with death caused by pneumonia and gastritis complications ?
" *A.* Yes, sir."

The stomach and contents were removed at the postmortem, and the body embalmed and buried. Later the body was exhumed, and the liver, kidneys, spleen, and bladder removed, and, with the stomach, sent to a chemist at Ann Arbor. His testimony is to the effect that he tested a portion of the stomach and contents for arsenic, found some, and by a calculation determined that the entire of the stomach and contents contained between one-fifth and one-sixth of a grain. The liver contained, by test and calculation, one-eighth of a grain of arsenic. A similar test and calculation resulted, he says, in showing the other organs to contain between one-ninth and one-tenth of a grain of white arsenic; the total amount at highest estimated figures being considerably less than half a grain. A fatal dose of arsenic is from two to three grains. The ordinary commercial subnitrate of bismuth,

a considerable quantity of which was administered to Leachman, contains arsenic. Whether the embalming fluid contained arsenic was in dispute. Assuming the presence of the arsenic in the remains, and that it was administered to Leachman in his lifetime, it was the opinion of the medical men sworn for the prosecution that the cause of his death was arsenical poisoning. Two groups of errors are discussed.

1. During the cross-examination of respondent, she was asked, in substance, if she had not stolen a muff, a quantity of dress goods, and some neckties from the store of a certain merchant, if they had not been charged to her, and if she had, upon demand, settled for them. She denied the various alleged thefts. In debating the objections which were interposed to the cross-examination which was conducted, the prosecuting officer, among other things, said:

"A person might commit the crime of larceny and never be convicted of it. He might have settled it up upon demand. Suppose, for instance, a party goes into a man's store and takes goods to the value of $7, without asking for them, without being in any way connected with the store, without the knowledge of any clerk or agent in the store, and carries them away without their knowledge. Afterward they are discovered and a warrant is issued, and the goods are found in the party's possession, and they settle for them. Would not that situation be competent?"

In rebuttal the people called the merchant, who testified that he was a druggist and clothing merchant, and he was asked:

"Q. Have you got your books of account in your store, covering the year 1901, with you, or any of them?

"A. I have.

"Q. Please open the package.

"A. There is the daybook, contains the 1901 accounts."

Witness testified that he was acquainted with Mrs. Collins, and had been for about 20 years; that he had seen her in New Lothrop with George Leachman.

" *Q.* What do you know in 1901 or 1902 of Mrs. Collins coming to the store with George Leachman and picking out clothing for him, with him?"

Upon objection being made, the following occurred:

" *Mr. Chapman:* I contend it is not a collateral matter, but that it bears upon the relation that the defendant sustained to the deceased, and, being upon that proposition, it is not a collateral matter.

" *Mr. McCurdy:* Then if that was true, it was a part of their main case, and not a part of the surrebuttal."

The court sustained the objection.

"*Q.* Mr. Synder, do you remember the transaction as to a muff, in 1901, that the defendant got from your store?"

Objection to this was sustained.

" *Q.* Mr. Snyder, on the 22d day of December, 1901, being the same day that defendant got the muff, you may state to the jury whether or not she got some goods there on that same occasion and had them charged in your books?

" *The Court:* I think that covers exactly the same condition.

" *Mr. Chapman:* This would be recorded evidence, would it not? * * * Suppose the witness knows of it and entered in his general books a charge for other goods upon that occasion, would not the fact of what the books show be competent evidence?

" *The Court:* I think the muff question and these goods are out of the case; being collateral matter, it is out of the case."

It is said in the brief for the people:

" Even if it were error to call Washington Snyder, which is by no means conceded, he was not permitted by the court to give any testimony which contradicted respondent upon this matter. He was allowed to answer a few preliminary questions, but nothing which would in any wise impeach the respondent."

To produce the merchant with his books, to proceed to the point of impeachment, to argue, in the presence of the jury, the right to impeach and to use in the argument alleged hypothetical statements covering the very facts

claimed, by insinuation and by inference, to exist, is likely to have all of the effect obtainable from open contradiction and impeachment. This court will assume, in this case, that the offer to prove was as prejudicial as the evidence would have been if the court had permitted the fullest impeachment.

2. Ira Wright, a boy nearly 14 years of age, was the nephew of respondent. His mother is living, but he had as a baby been taken by and had lived with respondent as a member of her family. The testimony, not disputed, is to the effect that respondent treated him like a son, kept him clean, sent him to school, and appeared to love him. He had reached an age when his services may be supposed to have been of value to respondent. He died some four months before Leachman's death. Dr. Bruce began to treat him early in June, 1903. He had known him for 6 or 7 years. He described his symptoms and his treatment. He was brought to his office by respondent. There was no attempt on her part to keep the doctor from making as complete and thorough an examination and diagnosis as he saw fit. He asked her questions in the presence of the boy, and also asked the boy questions. He again saw the boy at the office and afterwards at Mrs. Collins' home, and examined him, and made inquiries of both Mrs. Collins and the boy in regard to his condition, and continued to treat him until the 13th or 14th of June, when he went away for a week, returning June 20th. Dr. Shoemaker, by whom he was treated during the absence of Dr. Bruce, made his first call on him on the 15th of June. Dr. Shoemaker described the symptoms as he found them. He saw no symptoms during his treatment of Wright that he recognized as indicating arsenical poisoning. On redirect examination, he was asked this question:

"*Q.* Doctor, looking back over the case now and the symptoms that you have described, what do you say as to whether or not they are the symptoms of arsenical poisoning? * * *

"*A.* Taking in connection with the finding of the chemist.    *   *   *

*"Q.* Looking back over the case now, doctor, you may state whether, in your opinion, those symptoms that you saw Ira Wright suffering from are some of the symptoms of arsenical poisoning.    *   *   *

"*A.* They are.

"*Q.* State to the jury whether or not, in your opinion, they are all consistent with the arsenical poisoning. * * *

"*A.* They are."

On recross-examination, he testified that the fact claimed by the chemist to be true, namely, that he had found some arsenic in the organs of Ira Wright, was one of the things which caused him to believe or to think that possibly the symptoms or some of them might be due to arsenical poisoning; that, if the chemist had not found traces of arsenic, he would not recognize the symptoms or attribute them to arsenical poisoning; that the symptoms were consistent with some other disease. The body of this boy was exhumed and found to be somewhat decomposed, the stomach and other organs sent to Ann Arbor, and there examined by the chemist. The chemist found, he says, in the stomach, liver, kidneys, spleen, and bladder, about one-tenth of a grain of arsenic. The prosecution was permitted to lay before the jury the evidence of the death of this child, respondent's care of him, the discovery of the arsenic in the remains, with other details. It is not claimed—is expressly disclaimed —that there was a common scheme or plan embracing the killing of both Wright and Leachman. It is further expressly conceded that no possible common motive was shown or intimated. Whether it should be found that respondent administered arsenic to Wright and to Leachman, or to either, depended upon inferences which the jury might draw from the evidence admitted. In admitting the testimony, the trial judge stated:

" I will say to the jury now, in the outset, that the only purpose for which this testimony can be received is for the purpose of showing the presence of arsenic in the

house. That is all it is received for. No other purpose, and you will disregard every other purpose at this time unless further instructed."

In the charge, the jury were told to consider the evidence only for the purpose of determining "whether there was or was not arsenic there at the residence of respondent prior to and at the time of the sickness and death of George Leachman." The presence of arsenic in the remains of Wright had no legitimate tendency to prove that respondent had arsenic in her possession during the illness of Leachman. Undoubtedly, the giving of a wrong reason for admitting testimony is not prejudicial error, if the testimony is for any reason admissible and the jury is properly instructed concerning the use to be made of it. It is claimed here that this evidence was admissible to prove (1) intent; (2) absence of mistake or accident; and (3) identity of the person charged. If it was, for any of these purposes, admissible—questions which we do not consider—the error committed was not, for that reason, cured, and was clearly prejudicial. The record does not contain all of the evidence, for which reason, the singular circumstances of the case, and the positions assumed by counsel, it is deemed to be unwise to attempt to lay down any controlling rules respecting the use, if any, to be made of this testimony if it shall again be tendered. Authorities will be found collected in 1 Wigmore on Evidence, § 363, note 10. See, also, *People* v. *Thacker*, 108 Mich. 652.

The conviction is set aside, a new trial granted, and the respondent remanded to the custody of the sheriff of Shiawassee county, to be dealt with according to law.

CARPENTER, C. J., and MCALVAY, BLAIR, HOOKER, and MOORE, JJ., concurred with OSTRANDER, J.

GRANT, J. (*dissenting*). Respondent was convicted of the murder of her hired man, one Leachman, by administering arsenic. Errors are assigned upon the admission and exclusion of testimony, improper conduct of the prosecuting officers, and the charge of the court. The questions

involved are not new, and are familiar to the profession. It would serve no good purpose to discuss each assignment of error arising during the trial upon the testimony. It is sufficient to say that we find no prejudicial error in any of these rulings. The trial was eminently fair so far as the record shows, and the instruction of the court fully covered the case. The charge of improper conduct on part of the prosecuting officers, we think, is without foundation. Respondent was a witness in her own behalf, stated the story of her life, and gave an account of her relations with Leachman and Wright. On cross-examination, for the purpose of impeaching her veracity, counsel for the prosecution asked her whether she had not been charged with the larceny of certain goods, and whether she had not stolen a muff.and had subsequently paid for it. It was strenuously urged in behalf of the prosecution that the testimony was competent, and was argued at length before the court. Certain questions were admitted and others were excluded. When the prosecution in rebuttal produced the merchant as a witness, with the books of account, offering to show certain charges upon them, they were promptly ruled out. This occurred at the very close of the case, and the court, in ruling upon it, said: "I think the muff question and these goods are out of the case. Being a collateral matter, it is out of the case." During the argument upon the admissibility of this testimony, the court expressly instructed the jury that the arguments made were not for their consideration, and to pay no attention to them. The arguments cover several pages of the record, and when read as a whole I do not think there is anything in them which can be held to have prejudiced the jury in a case of this character.

Error is assigned upon the introduction of evidence showing that one Ira Wright, a nephew of the respondent, a boy about 14 years of age, who had lived with her from infancy, had died from the effects of arsenic at her home about four months previous to Leachman's death. The

respondent took care of the boy, prepared his food, and administered medicine as she did, also, in the case of Leachman. There was strong evidence showing that both the boy and Leachman were affected by the same symptoms. After the death of Leachman the body of the boy was exhumed, his stomach and intestines subjected to a chemical examination, and arsenic found therein. The purpose of this testimony as claimed by the prosecution was to show intent, absence of mistake or accident, and identity of the person charged with the crime. Counsel for respondent insists that this testimony, tending to establish another crime, was inadmissible under *People* v. *Jenness*, 5 Mich. 305; *Lightfoot* v. *People*, 16 Mich. 507; *People* v. *Molineaux*, 168 N. Y. 264 (62 L. R. A. 193). Counsel states his position thus:

"The alleged murdering of Ira Wright does not come within any of the exceptions of the rule of exclusion of testimony of other distinct crimes. It was certainly not a part of the res gestæ; having occurred some four months previous, there was no possible common motive shown or intimated. * * * Leachman's death was not claimed to be due to mistake or accident; no common scheme or plan, embracing or requiring the commission of both crimes, was established, or even suggested; and in no way does the poisoning of Ira Wright, if he was poisoned, tend to identify the respondent as the one who poisoned Leachman, if he was poisoned. The admission of testimony concerning the death of Ira Wright was clearly prejudicial error, requiring her to acquit herself of two crimes instead of one charged in the information."

Upon this subject the court instructed the jury as follows:

"I now particularly call your attention to the testimony that has been introduced relative to Ira Wright, his physical condition and symptoms before death, and the claim of the prosecution that arsenic was found in his remains after his death, and the bearing which such testimony may or may not have upon the principal issue in this case. Bear in mind, gentlemen, that this defendant is here upon trial only for the murder of George Leachman by means of arsenic, which, it is claimed by the prosecution, defend-

ant administered to him, causing his death, and that this defendant is not on trial here for the murder of Ira Wright, nor for any other crime or offense except for the murder of George Leachman by the means above mentioned.

"The rule of law is that other crimes or offenses cannot be proved for the purpose of showing that the defendant was more likely to have committed the crime for which she is on trial, nor as corroborating the testimony relating to the crime or offense for which she is on trial; but this rule is not infringed upon where such evidence or testimony tends to show some essential fact relative to the guilt of the accused of the crime charged, and for which the accused is on trial, merely because it may also tend to show the commission of another crime or offense for which the accused is not upon trial, and the great danger of the admission and use of such testimony lies in the fact that jurors, through misapprehension, lack of care, discrimination, and the like, may give to such testimony improper and unwarranted bearing, force, or effect. Be careful and cautious in your consideration of these matters, remembering all the time that you should not, and must not, consider such testimony for the purpose of establishing whether this defendant, in fact, administered poison to George Leachman. Again I repeat that. Be careful and cautious in your consideration of those matters, remembering all the time that you should not, and must not, consider such testimony for the purpose of establishing whether this defendant, in fact, administered poison to George Leachman.

"Before we can give such testimony any consideration whatever as bearing upon the question of the guilt of this defendant of the murder of George Leachman, you must be satisfied from the evidence, and beyond a reasonable doubt, *first,* that arsenic was in the remains of Ira Wright at the time of his death; *second,* that such arsenic did not get into his remains by or through the use of embalming fluid or through any means other than by passing into his body while he was living, and, if the evidence relative to such matters fails to establish either of such facts beyond reasonable doubt in your minds, you should not further consider any testimony which has been introduced here relative to the death of Ira Wright, or what was found in his remains after his death. These facts must be first established.

"But, on the other hand, if you find from the evidence, and beyond reasonable doubt, that, as a matter of fact, arsenic was in the remains of Ira Wright at the time of his death, and also that such arsenic did not get into his remains by or through the use of embalming fluid, or through any means other than by passing into his body while he was living, you may then, and not until then, consider such facts so found by you, together with the other evidence in the case bearing upon the question, in determining whether there was or was not white arsenic there at the residence of this defendant prior to and at the time of the sickness and death of George Leachman; for, unless there was arsenic present there at the residence of defendant in some form, such poison could not by any possibility have been administered to George Leachman by this defendant or any one else.

"There is no evidence showing or tending to show that any poison was administered anywhere else to George Leachman by the defendant, so that confines it to the residence of this defendant.

"You may also, if you find that, in fact, arsenic was there present at the residence of the defendant in any form prior to and at the time of the last sickness and death of George Leachman, consider such fact, and in connection with all the other evidence in the case bearing upon the question in determining whether this defendant did or did not have knowledge that such arsenic in some form was there present at her residence during the last sickness of George Leachman.

"I have now stated to you the only bearing that the testimony which has been introduced here relative to the manner of the death, symptoms before death, and as to what they claim to be found in the remains after death of Ira Wright, can have in determining the issue in this case, and you are not to give such matters any consideration, bearing, or weight, in any manner or for any other purpose than as I have stated to you."

It is a general rule, both in England and in the United States, that proof of other crimes is not competent for the jury to consider in determining whether a respondent is guilty of the specific crime charged. To this general rule there are many exceptions.

"Generally speaking, evidence of other crimes is competent to prove the specific crime charged when it tends

to establish (1) motive; (2) intent; (3) the absence of mistake or accident; (4) a common scheme or plan embracing the commission of two or more crimes so related to each other that proof of one tends to establish the other; (5) the identity of the person charged with the commission of the crime on trial." *People* v. *Molineaux*, 168 N. Y. 293.

Wharton on Criminal Evidence (9th Ed.), § 48. Chief Justice Parker, in his dissenting opinion in that case, at page 341, cites a long list of cases which are exceptions to the general rule. It is unnecessary to here cite the cases, or to determine whether the present case comes within the exceptions as above stated and as recognized by this court. *People* v. *Seaman*, 107 Mich. 348, and authorities cited. This testimony was admitted for only one purpose, and that was to show the existence of arsenic in the respondent's house and its use by her shortly before the death of Leachman. We think there is no doubt of its admissibility for that purpose. It would certainly have been competent to show that arsenic was found in her house at the time or shortly before the illness and death of Leachman, or that she had it for any purpose whatever. If she had used arsenic in poisoning animals, it would clearly have been competent to show that the organs of the dead animals contained the arsenic, for the purpose of showing not only that she had it, but that she knew its effect. This evidence was none the less competent because it was found in the stomach and other organs of the boy Wright, if it were also established beyond a reasonable doubt that she administered the poison to him. Her possession and use of the poison at the time of the illness of Wright were competent, because they tended to show that she kept the poison in her house and was familiar with its use.

We deem it unimportant to discuss the errors assigned upon the instruction of the court. The instructions, as a whole, submitted the case to the jury with the utmost fairness. After describing the crime with which the defendant was charged, the court said:

"That is the offense for which this defendant is upon trial; for no other offense. Before you can rightfully and lawfully convict this defendant of the crime here charged against her, you must be able to find, and find from the evidence in this case, and beyond reasonable doubt:

"*First*, that said George Leachman is dead and came to his death by means of a deadly poison known as arsenic.

"*Second*, that such poison was administered to said George Leachman in his lifetime and by this defendant.

"*Third*, that this defendant here so administered such poison to the deceased, George Leachman, willfully, knowingly, and with the intent upon her part of depriving him, said George Leachman, of his life.

"*Fourth*, that the said George Leachman died as the result of the administration to him of such poison, or, in other words, that such poison so administered by the respondent killed said Leachman, and that he did not die from any other cause or disease."

In order to emphasize it he repeated it to the jury. There is no part of his instructions inconsistent with that above.

The conviction should be affirmed.

Montgomery, J., concurred with Grant, J.