PEOPLE v. DROSTE.

1. CRIMINAL LAW—EVIDENCE—HOMICIDE—MOTIVE.

That a respondent charged with homicide told a girl with whom he and deceased were friendly that if she knew what the deceased said about her she would never speak to him again, tends to show the relations among them and to disclose a possible motive for the crime.

2. SAME—CONSTITUTIONAL LAW—RIGHT TO BE CONFRONTED WITH WITNESSES.

It is not error to admit a deposition in evidence against respondent where it was taken on the preliminary examination before the justice of the peace, counsel having availed himself of a full cross-examination, and the witness was subsequently taken seriously ill, so that she could not appear at the trial, at which the judge offered respondent the right to take her statement at her home.

3. SAME—EVIDENCE—IMPEACHMENT.

An impeached witness may explain away the effect of the supposed inconsistency by relating whatever circumstances would naturally remove it.

4. SAME—TRIAL—STRIKING OUT EVIDENCE.

Improper testimony offered by a witness and struck out at once by the court on objection is not reversible error.

5. SAME—MURDER AND MANSLAUGHTER—TRIAL.

The trial court properly refused to charge that the respondent must be found guilty of murder or was innocent, when the evidence supports the theory that the crime may have been committed in the heat of passion while respondent was under the influence of liquor, and constituted manslaughter.

6. SAME—MALICE—INTENT—MANSLAUGHTER.

A charge that, in order to constitute manslaughter, the respondent's "reason should, at the time of the act, be disturbed or obscured by passion or by an excitement of any cause to an extent which might render ordinary men of fair average disposition liable to act rashly or without due deliberation or reflection and from passion rather than from judgment," is favorable to a respondent convicted of that charge. *Maher* v. *People*, 10 Mich. 212 (81 Am. Dec. 781).

7. SAME—SELF-DEFENSE—INSTRUCTIONS TO JURY.
  A failure to leave to the jury the issue of self-defense is not error where respondent denied committing the crime and failed to request such a charge.

Exceptions before judgment from Ionia; Davis, J. Submitted November 15, 1909. (Docket No. 169.) Decided March 5, 1910.

Joseph Droste was convicted of manslaughter. Affirmed.

*R. A. Hawley,* for appellant.

*John E. Bird,* Attorney General, and *Dwight C. Sheldon,* Prosecuting Attorney, for the people.

Respondent was convicted of manslaughter, and brings his case here for review, upon exceptions before sentence. The record shows that respondent and deceased, Benno Cook, were both young men, respondent about 28, and Cook about 22, years of age; that they were born and reared upon adjoining farms, about 2½ miles from the village of Pewamo, Clinton county, in this State. They had been friends and chums, visiting each other frequently and going about together for several years. The record further shows that respondent paid attentions to a young woman of the neighborhood, one Barbara Miller, and that, while Benno Cook had never "kept company" with her, he was upon friendly terms with her, often visiting at her home. On the morning of May 16, 1908, respondent drove to the village of Lyons, where he attended an auction sale. He left Lyons between 6 and 7 in the evening, driving to the village of Pewamo, where he placed his horse under the Baptist church shed. He then returned to the business portion of the village, visiting the drug store and the two saloons, at both of which he drank. He had been drinking while at Lyons, and it is established beyond controversy that at the time the deceased received his death wound respondent was intoxicated. Witnesses

do not agree as to the degree of intoxication, but all (including respondent himself), agree that he was under the influence of liquor, to some extent. He drank and played a game of cards with deceased in one of the saloons. There is evidence (denied by respondent) tending to show that, during the evening, a quarrel occurred between him and deceased, in the course of which respondent called deceased a damned liar. When Geller's saloon closed, respondent and deceased, together with Droste's brother, Cook's brother, two of Cook's cousins, and one Witzel, left together. The Baptist church is located one block south and one block west of Geller's place. The young men started south in a body, and, when near the corner, respondent crossed to the west side of the street, and invited deceased to ride home with him, to which invitation deceased made no response. When it was repeated, deceased replied that he would walk with the boys. Being again invited by respondent, he followed him across the road, and the two proceeded west along Main street, to the Baptist church. Two of the remaining five boys followed to ascertain whether respondent really had a horse and buggy under the church shed. When near enough to distinguish a buggy under the shed, they returned to their companions at the corner, and all five started south towards home. Respondent and deceased were seen to enter the churchyard together, at which time deceased was in perfect health. When the boys had proceeded south nearly half a mile, they were arrested by loud talk and swearing, the sounds indicating an altercation, and coming from the direction of the Baptist church, in their rear. Thereupon they ran back towards the village, but had gone only about 40 rods, when they heard and saw a horse and buggy rapidly approaching them. When it came up, they recognized respondent and deceased as its occupants, and inquired of them if there was a fight up town. Respondent said, "No," stopped his horse, and invited his brother, Eddie, to get in and ride, which he did. Shortly after, deceased

complained of a pain in his abdomen.  When the three
reached the corner, where, if he went directly home, de-
ceased would have to walk, he (deceased) said he wished
he was home; respondent replied that, if he did not feel
well, he would drive him home—a short distance.  Upon
arrival at the Cook home, deceased alighted from the
buggy, and went up to the house, and respondent and his
brother turned around and went home.  The father of de-
ceased, coming home some time later, heard groans, and,
upon inquiry, deceased complained of pain in his abdomen.
Hot cloths were applied outside his garments, and some
simple remedy administered by the mother of deceased.
Towards morning the pain continuing severe, the father
examined deceased, and found a large quantity of his in-
testines protruding from a wound (evidently inflicted by
a knife or other sharp instrument) in the abdomen.  Med-
ical aid was secured, and an operation was performed.
The wound was enlarged, and the intestines returned to
the abdominal cavity.  Deceased was conscious both be-
fore and after the operation, but died about 4 o'clock in
the afternoon of the day following the evening spent in
Pewamo.  He died without disclosing the circumstances
of the assault or the name of his assailant although he
was questioned as to both.  Aside from the five boys al-
ready mentioned, not less than seven other persons, being
located at distances varying from 300 feet to nearly 900
feet from the church shed, testified to hearing loud, angry,
and profane talk in the church shed, or in that immediate
vicinity, at the time respondent and deceased were there.
Some of these witnesses were unable to distinguish the
exact language used, but several testified that they heard
distinctly the words, " I will cut your damned heart out."
" I will cut you wide open."  Elizabeth Yost, who lived
directly across the street from the church shed, being
awakened by loud talk and profanity, testified that she
heard some one say, " You get out of that buggy again,
and I will rip you wide open."  She also saw the horse
move from side to side, upon the crosswalk leading from

the shed. On Saturday night respondent slept in the barn, and did not join his family either at breakfast or the noonday meal the next day. That afternoon he went over to the Cook farm, but not until after Benno Cook had died. He attended the funeral and sang in the choir, of which he was a member. His arrest followed shortly afterwards.

On May 21st, five days after deceased received his death wound, respondent made, signed, and swore to a statement in presence of a justice of the peace, the prosecuting attorney, the sheriff and others. The statement was offered in evidence by the people, and was received without objection by respondent. It is as follows:

"Statement of Joseph Droste taken and made before me, Henry C. Clark, a justice of the peace, on the twenty-first day of May, 1908.

"My name is Joseph Droste. Am 28 years old. I live in Clinton county, Dallas township. I was in Pewamo on Saturday evening, May 16th, 1908.

"I started away from my home about 10:30 a. m. that day and drove to Lyons to an auction sale. I had some beer to drink there at Lyons, and stayed there from the time I arrived there in the morning until in the afternoon about 6:30. I was at the auction sale held by a man by the name of Searing. I drove my horse up town and went into a saloon there, and had two glasses of beer there and went to the sale and stayed until I started away about 6:30.

"Nick Kraemer and Jacob Conan were with me. We got to Pewamo about 7:30; when I got to Pewamo I put my horse in the Baptist church shed. From there we went to Charles Frederick's saloon. Nick Kraemer, Jacob Conan, and I, we three had one glass of beer there, and from there I went to the drug store. I went from the drug store to Willie Geller's saloon.

"The first time I saw Benno Cook was there in front of Geller's saloon. This was about 8 or 8:30 o'clock in the evening. Benno was there with the Cook boys. I went over at that time across the street and stood in front of the harness shop and Joe Miller's restaurant. I did not see Benno for a long time.

"I next saw him in Willie Geller's saloon; we had a game of cards at that time. Ellis Cook and I played

against Benno Cook and Willie Geller, the proprietor of the place. Benno and I took a cigar after the game. I went outside the saloon shortly after the game of cards was over.

"Ellis Cook said to me, 'Let's go over to Charles Frederick's saloon,' and we both went over there but I did not drink anything there at that time. From there I came out of the saloon and went up in front of Joe Miller's restaurant and there I talked with Barbara Miller, Lizzie and Kate Miller. I must have talked with them about a half an hour. I went from there to Willie Geller's saloon and Benno Cook was there in the saloon at that time. We sat there until we went home. We stayed in the saloon from that time until the saloon closed up. We went out of the doors together; I see the boys and we started home; I walked with the rest of the boys until we got up to Irish's corner; when we got there I said, 'Come on, Benno, and ride with me.' Benno says, 'I don't care, I can walk.' I says, 'You might as well ride,' and at that time Benno and I started up the street west towards the church shed.

"Edward Droste and Arthur Cook followed us up to pretty near the end of the fence. They were about right behind us. I did not see any one around there; that is, around the church shed, at that time. If there had been any one there I would have seen them, because it was a very bright moonlight night. I don't remember having any quarrel with Benno or with any one else that evening. I don't remember of any one having a quarrel—I don't remember of hearing any loud talking or swearing at the church shed or anywhere else that evening.

"As near as I can remember, when I got to the church shed where my horse was I unfastened it and drove away. I think I was not there more than five minutes. I don't remember having any trouble with Benno. If I did, I don't remember it. I might have had, but I don't remember if I did. I did not see anybody else there, and Benno did not have any trouble with any one else. If he had have had trouble with any one else I would have known it. As far as I can remember we all were the best of friends. I can't remember of doing anything else only to get my horse and start for home.

"When we overtook the boys near John Fox's place, I asked my brother Ed if he would ride with us. Ed Cook asked us if we had seen any trouble or fight and we both

said, 'No.' He got into the buggy and we three went over there to the Cook home where Benno got out; Ed sitting on our knees and driving the horse.

"Benno commenced to complain about thirty rods west of the Louis Cook corners. He said he had an awful pain in his belly and that he at that time doubled up and lay across my knees. When we got to the corner where we turned south toward home, Benno said, 'I wish I was home.' When we got to the corners he went to get out, and I said to him, 'I will take you home if you don't feel good.' He was well pleased with that, and then I took him home. He got out of the buggy and said good night, and that was the last of it. This is all I can remember at present. I had been drinking that day considerable and was under the influence of drink to quite an extent, and when in that condition I am quite easily to anger and quite irritable, and if I did this I must have been under the influence of drink to such an extent that I cannot remember it at the present time.

"I make this statement of my own free will because it is true, and without any promises from the officers or any one else.

[Signed]        "Joseph Droste.
"Subscribed and sworn to before me this twenty-first day of May, A. D. 1908.
                   "Henry C. Clark,
                   "Justice of the Peace."

When respondent was sworn in his own behalf, upon the trial, this statement was varied in some particulars, the most important being that when respondent and deceased entered the churchyard the deceased fell behind a short distance; that he heard voices behind him; that he thought he might have seen another man besides Cook in the yard; and that when Cook came up to the buggy to get in, respondent asked him with whom he had been talking, to which he replied in German, "that damned Nick." Between the time of the commission of the crime and the trial, one Nicholas Kraemer, an uncle of the deceased, who was addicted to the excessive use of intoxicating liquors, had died. The defense endeavored to show that the crime might have been committed by

Kraemer, and that some ill feeling had existed between Kraemer and deceased.

BROOKE, J. (*after stating the facts*). The first two assignments of error relate to the testimony of Barbara Miller, who was permitted to state with whom she had attended certain parties in 1907 and 1908, and to detail a conversation had with respondent in April, 1908, relative to deceased. She testified:

"Benno had asked to take me home, and I told Joe on the way going home; Joe said if I knew what Benno said about me, I would never speak to him again."

We are of opinion the testimony was competent as tending to show the relation then existing between respondent, deceased, and the witness, and as tending to disclose a possible motive for the commission of the crime.

Respondent next assigns error upon the admission by the trial court of the deposition of Lena Kraemer, widow of Nicholas Kraemer, taken upon the examination before the magistrate. It appears that on Saturday of the first week of the trial the prosecutor announced that Mrs. Kraemer was about to be confined and therefore could not attend and give her testimony. He then offered her testimony taken before the magistrate. Respondent's counsel objected. Thereupon, the court suggested that she be examined at her home. To this proposition counsel for the people assented, but respondent's counsel neither assented nor refused. Upon the following Monday the matter again came up, and again counsel for respondent did not consent to taking the testimony at Mrs. Kraemer's home. On Tuesday the deposition was again offered, and, after a lengthy discussion, the court said:

"As I said yesterday, the deposition will be received, but the other party will have the right, some time during the trial, to take her deposition if she is in such shape it can be."

The deposition was then received. No motion was

made by respondent's counsel for a continuance, and we think it is apparent from the record that he was not very anxious to subject the witness to further cross-examination, otherwise he would have consented to attend an examination of the witness at her home, as proposed by the court, and assented to by the prosecutor. The examination before the magistrate was taken stenographically, in the presence of respondent and his counsel. There was opportunity for full cross-examination, of which counsel for respondent availed himself.

The precise question here involved received consideration in the case of *People* v. *Farrell*, 146 Mich. 264 (109 N. W. 440), where this court said:

"One Fry was a witness for the prosecution upon the former trial. He was sick and confined to his bed during the progress of this trial. Near the close of the case for the prosecution the prosecutor announced that Mr. Fry was ill and unable to come to court. A recess was taken. After recess the physician was produced to show that Mr. Fry was unable on account of illness to attend court. Counsel for the defense waived the testimony of the physician. The sheriff was sent to bring the witness. He returned, announcing that he had a high fever and could not come. The testimony given upon the former trial was then read by the stenographer. This is urged as error. Counsel for respondent cite no authorities. The question does not appear to have arisen in this court. Upon proof of the death of a witness his former deposition may be read. *People* v. *Sligh*, 48 Mich. 54 (11 N. W. 782). Was its admission in violation of the rule that a respondent is entitled to be confronted with the witnesses against him? He had been confronted with the witnesses and had had the opportunity of cross-examination. The exceptions to the rule are stated by Justice COOLEY as follows:

" ' If there were a former trial on which he [witness] was sworn, it seems allowable to make use of his deposition, or of the minutes of his examination, if the witness has since deceased, or is insane, or sick and unable to testify, or has been summoned but appears to have been kept away by the opposite party.' Cooley on Constitutional Limitations (4th Ed.), p. 318.

"*This rule comports with common sense,* and we think the testimony was admissible."

It is urged on behalf of respondent that, inasmuch as a difference of opinion arose among the justices as to another important question involved in that case, this point was not fully considered. We believe, after a careful examination of all the opinions written in that case, it can fairly be said, that upon the point in question there was no diversity of opinion. If this be true, the point has become *stare decisis* and should so remain, unless it can be shown upon principle or authority that a different rule should be adopted. The rule as here enunciated is not at variance with the decisions of this court in the cases of *Howard* v. *Patrick,* 38 Mich. 795, and *People* v. *Sligh,* 48 Mich. 54 (11 N. W. 782), though certain language used in the latter case by Mr. Justice CAMPBELL (not necessary for the determination of the matter there before the court) would seem to indicate that, had the court at that time been called upon to determine the question now here, it would have reached a different conclusion than that announced in the case of *People* v. *Farrell, supra.* The rule is not in harmony with the decision in the case of *Siefert* v. *Siefert,* 123 Mich. 664 (82 N. W. 511)—a civil case. There, Mr. Justice GRANT, speaking for the court, said:

"The only safe rule is that the illness must be of a permanent character. We think this is the rule sustained by the authorities."

2 Wigmore on Evidence, § 1406, states the rule as follows:

"Any physical incapacity preventing attendance in court, except at the risk of serious pain or danger to the witness, should be a sufficient cause of unavailability; and this has been almost universally recognized by the courts."

Many cases are cited, among them two involving the illness of a witness, similar to that under considera-

tion here. *Reg.* v. *Harney*, 4 Cox Cr. Cas. 441; *Reg.* v. *Stephenson*, 9 Cox Cr. Cas. 156.

16 Cyc. p. 1101, states the rule to be:

" Where, in a civil or criminal case, a witness since the former trial has become insane or bereft of memory by senility, his former evidence, as a rule, is admissible, although the witness himself is in court. * * * It has also been held in many cases that sickness which prevents attendance as a witness, extreme age, or great bodily infirmity, suffice to admit the evidence, except in some jurisdictions where, in criminal cases, nothing but death relieves the prosecution from the necessity of producing the original witness."

This author (Wigmore) treats the subject exhaustively (volume 2, §§ 1395–1418), and concludes that the great weight of authority favors the admission of such evidence, as well in criminal cases as in civil cases, and where the illness is temporary only, as well as where it is permanent, or the witness has died. And upon principle, we are unable to appreciate any good reason why the people or respondent should have the benefit of such evidence, in cases where the witness is dead or permanently ill, and be denied that benefit when the witness is only temporarily ill. In all three cases, the important fact is identical— the witness cannot be produced in person to testify before the jury. The case of *Commonwealth* v. *McKenna*, 158 Mass. 207 (33 N. E. 389), has been considered, as well as others of like character. In that State (Massachusetts), the courts have held rigidly to the doctrine that death alone would excuse the production of the witness, and permit the introduction of his testimony, taken at a former trial. This rule excludes the testimony of one permanently ill, as well as that of one temporarily ill, and is, as we believe, not supported by the weight of authority. The fact that this testimony was taken before the examining magistrate, instead of upon a former trial, does not change the rule. *People* v. *Dowdigan*, 67 Mich. 95 (38 N. W. 920); *United States* v. *Macomb*, Fed. Cas. No. 15,702; *United States* v. *Penn*, Fed. Cas. No. 16,025.

Upon that hearing, the respondent was confronted with the witness and had, and availed himself of, full opportunity for cross-examination. We are of opinion that, by the admission of the testimony in question, the constitutional right of the respondent to be confronted with the witness against him was not abridged.

Clara Wirtz, a witness for the people, gave testimony as to what words she had heard on the night of the homicide. Upon cross-examination, her attention was called to a conversation, had between herself and a Mrs. Hankins. She denied making certain statements to Mrs. Hankins, as to what she had heard. Mrs. Hankins was called by the respondent to impeach her. Error is assigned upon a ruling of the court, permitting the people to show, by Miss Wirtz, what she did say to Mrs. Hankins. The testimony was proper. See 2 Wigmore on Evidence, § 10445, where the author says:

"The impeached may always endeavor to explain away the effect of the supposed inconsistency, by relating whatever circumstances would naturally remove it"—citing many cases.

Error is assigned upon the action of the court, with reference to certain testimony given by Leo Cook and Philip Simmons. The court struck out the testimony in both instances, and in the second said to the jury:

"All of that testimony would be valueless, so it will not be received at all; it will not be given any consideration."

Counsel for respondent urges that the error in receiving the testimony was not cured by the remarks of the court. If this claim can be sustained, we are at a loss to know how a trial could be properly conducted. It is manifest that the answer of a witness cannot be known until it is uttered. If, being incompetent, it is then stricken out, the error is cured, or rather there is no error. It must be presumed that the jury considers only the testimony permitted by the court to stand. The case of

*People* v. *Collins,* 144 Mich. 121 (107 N. W. 1114), is distinguished. There this court said:

" To argue, in the presence of the jury, the right to impeach, and to use in the argument alleged hypothetical statements covering the very facts claimed, by insinuation and by inference, to exist, is likely to have all of the effect obtainable from open contradiction and impeachment."

No such situation exists in the case at bar. The testimony was offered in good faith; it lacked the necessary certainty, was stricken out, and the jury cautioned.

Many errors are assigned upon the charge of the court, particularly those portions thereof relating to:

(1) The presumption of innocence.
(2) Reasonable doubt.
(3) Burden of proof.
(4) Manslaughter.
(5) Self-defense.

We have examined the charge with great care, and find that most of it is couched in language which has heretofore received the stamp of approval from this court. The instructions were clearly correct upon the first three points.

Touching the fourth—manslaughter—it was claimed by respondent that the court should charge the jury that respondent was guilty of murder, in either the first or second degree, or he was innocent; citing *People* v. *Repke,* 103 Mich. 459 (61 N. W. 861); *People* v. *Nunn,* 120 Mich. 530 (79 N. W. 800); and *People* v. *Owen,* 154 Mich. 571 (118 N. W. 590, 21 L. R. A. [N. S.] 520). The crime in each of these cases was committed in the presence of eyewitnesses. In the case at bar, the evidence is wholly circumstantial, and there is involved the question of respondent's intoxication, whether the act was committed in the heat of passion, or in a sudden affray (indicated to some extent by the loud and angry language used by the assailant of deceased, at the time of the homicide). It will be remembered, too, that while respondent upon the stand denied that he had committed the assault,

there is no doubt that he and deceased were together in the churchyard, at the time it was committed, and while the loud and angry threats were uttered.   There is evidence likewise tending to show some ill feeling between respondent and deceased, and trouble between them earlier in the evening.   The jury, from all the facts of the case, may have concluded that respondent was alone with deceased at the time of the homicide, that he struck the fatal blow, but that, at the moment, his intoxication or passion was such as to rob his act of the necessary elements of murder, and we are of opinion that this view of the testimony was warranted.   The trial court was clearly warranted in submitting the case to the jury on the theory of manslaughter, as well as that of murder.   *Baker* v. *People*, 40 Mich. 411; *People* v. *Hamilton*, 76 Mich. 212 (42 N. W. 1131); *People* v. *Wolf*, 95 Mich. 625 (55 N. W. 357); *People* v. *Palmer*, 96 Mich. 580 (55 N. W. 994). See, also, *State* v. *Magers*, 35 Or. 520 (57 Pac. 197), and cases cited.

Upon the question of manslaughter, the court charged the jury as follows:

" Manslaughter is the unlawful killing of another without malice, express or implied.   The offense is one that is committed without malice or premeditation, the result of temporary excitement by which the control of the reason is disturbed, rather than from any wickedness of the heart or cruelty or recklessness of disposition.   The general rule is that reason should, at the time of the act, be disturbed or obscured by passion, *or an excitement of any cause*, to an extent which might render ordinary men of fair, average disposition, liable to act rashly or without due deliberation or reflection, and from passion and lack of reason rather than from judgment."

This language is taken from the decision in the well-considered case of *Maher* v. *People*, 10 Mich. 212 (81 Am. Dec. 781), the only interpolation being the words italicised, " or an excitement of any cause."   This addition to the approved definition, had evident reference to the intoxicated condition of respondent, and was war-

ranted by the facts in the case. And, in any event, it was a variation distinctly favorable to respondent, and, therefore, one of which he has no reason to complain.

It is urged that, the court having submitted the case to the jury upon the theory of manslaughter as well as murder, it was his duty to have instructed the jury upon the question of self-defense. This would be true, and the authorities cited by respondent's counsel would be pertinent, if respondent had admitted the homicide, but claimed he acted in self-defense. No such claim was made. Respondent's theory was that the fatal blow was delivered by another than himself, and that he was wholly innocent. No request to charge upon the subject was preferred by the respondent, and under these facts of the case no instructions were necessary.

Other errors are assigned upon the charge of the court, all of which have been carefully considered, but we believe they are without merit.

The case was carefully tried, and was submitted to the jury under a charge which we think fully protected the rights of the respondent.

Error is assigned upon the refusal of the court to grant a new trial. Discussion of the affidavits filed thereon, and reasons urged, is unnecessary. It is sufficient to say that we are of opinion the motion was properly denied.

The conviction must be affirmed, and the court directed to proceed to sentence.

HOOKER, MOORE, MCALVAY, and BLAIR, JJ., concurred.