PEOPLE *v.* MITCHELL.

1. Poisons—Chloral Hydrate—Verdicts and Findings—Evidence.
   In prosecution of husband and wife for mingling a poison, chloral hydrate, with beer for a police officer with intent to kill or injure him, denial of motion to direct verdict for wife *held*, justified by evidence and verdict not against the weight of the testimony (Act No. 328, § 436, Pub. Acts 1931).

2. Criminal Law—Poisons—Intent—Evidence.
   In prosecution of husband and wife for mingling poison with beer for police officer with intent to kill or injure him so as to enable them to rob him, testimony of female witness that she had been told by defendants about knock-out drops and by the wife to bring any men that had money up to their rooming house and witness would get a share was admissible on matter of intent under statute (3 Comp. Laws 1929, § 17320; Act No. 328, § 436, Pub. Acts 1931).

3. Same—Poisons—Prejudicial Testimony—Curing Error.
   In prosecution of husband and wife for mingling poison with beer for police officer with intent to kill or injure him so as to enable them to rob him, admission of testimony of former taxi driver that defendant wife had told him to bring passengers with money to their rooming house and that he would get a share of the money, if error, was cured by striking the testimony (Act No. 328, § 436, Pub. Acts 1931).

4. Same—Poisons—Instructions—Request to Charge.
   In prosecution of husband and wife for mingling a poison, chloral hydrate, with beer for police officer with intent to kill or injure him so as to enable them to rob him, refusal of request to charge that people must prove beyond a reasonable doubt that drug administered was a poison and was mixed in sufficient quantities to be poisonous in fact to the individual for whom intended so that he would suffer injury, *held*, not reversible error in view of instruction given which clearly stated principles of law applicable (Act No. 328, § 436, Pub. Acts 1931).

5. SAME—POISONS—INSTRUCTIONS—ENTRAPMENT.
   In prosecution of husband and wife for mingling poison with
   beer of police officer with intent to kill or injure him so as to
   enable them to rob him, instruction relative to entrapment,
   reciting the evidence, and stating that if the officer induced
   defendants to commit the crime or persuaded them to do so
   through another person, defendants would not be guilty *held*,
   not error (Act No. 328, § 436, Pub. Acts 1931).

6. SAME—POISONS—INSTRUCTIONS—CONSPIRACY—INFORMATION.
   In prosecution of husband and wife for mingling poison with
   beer of police officer with intent to kill or injure him so as to
   enable them to rob him,. instruction relative to conspiracy,
   supported by evidence, *held*, not erroneous, notwithstanding
   information had not charged conspiracy (Act No. 328, § 436,
   Pub. Acts 1931).

Appeal from Recorder's Court of Detroit; Cotter (Thomas M.), J. Submitted April 17, 1941. (Docket No. 80, Calendar No. 40,997.) Decided June 2, 1941.

Tazie Mitchell and Henry Mitchell were convicted of mingling poison with food, drink or medicine, with intent to kill or injure a person. Defendant Tazie Mitchell appeals. Affirmed.

*Louis Tucker,* for appellant.

*Herbert J. Rushton,* Attorney General, *William E. Dowling,* Prosecuting Attorney, and *Henrietta E. Rosenthal,* Assistant Prosecuting Attorney, for the people.

CHANDLER, J. The defendants were informed against and charged with a violation of Act No. 328, § 436, Pub. Acts 1931 (Comp. Laws Supp. 1940, § 17115-436, Stat. Ann. § 28.691), which reads as follows:

"Any person who shall mingle any poison with any food, drink or medicines, with intent to kill or

injure any other person, or shall wilfully poison any spring, well or reservoir of water, with such intent, shall be guilty of a felony.''

Trial followed, resulting in the conviction and sentence of both defendants. Defendant Tazie Mitchell appeals, alleging numerous errors. Defendant Henry Mitchell took no appeal.

The testimony of the witnesses for the people was substantially as follows: that appellant and her husband, defendant Henry Mitchell, were in April, 1939, running a rooming house on Fourth street in the city of Detroit, and that on the morning of April 15th at about 7 o'clock one Joe Gonzales, a long-time acquaintance of appellant, after having drunk considerable beer between the hours of 2 and 7 a.m., came to the rooming house in question and there drank beer furnished by appellant, and shortly thereafter went to sleep, and, as he expressed it, ''I drank that down and everything went blank. The next thing I remember I was in the bathroom, my shoes were off and my pockets were empty. I figured I had about $12 in my pocket when I took the last drink which was about 7:30 in the morning  *  *  *  and Tazie Mitchell was standing right alongside of me.'' Gonzales further testified that when he awoke he felt numb all over and was weak for a week thereafter. Gonzales in a few hours after this occurrence reported it to the police and Patrolman James Dunleavy was assigned to the case. On the evening of April 16th at about 7 o'clock in company with Gonzales, he went to the Mitchell rooms and there simulated intoxication. They asked for beer but were told by defendant Mitchell that they had none and to come back later. At this time Gonzales gave to Mitchell $2, which had been furnished him by Officer Dunleavy, to purchase beer with. Later that evening about 9 o'clock,

the officer and Gonzales again went to the Mitchell rooms and while there the officer purchased three rounds of beer for Gonzales, the defendants, and himself. The officer testified he noticed his beer tasted bitter and, being satisfied it was doped, did not swallow much, if any, of it but managed to spill or throw away most of the first drinks. The beer served by Henry Mitchell and that given to Officer Dunleavy contained a chemical known as chloral hydrate, according to admissions made by defendant Henry Mitchell and determined by chemical analysis. After being served the third drink, the officer gave a signal which had been agreed upon between himself and other officers; and the other officers, upon receiving said signal, came into the room and Dunleavy gave to one of the officers, Patrolman Charles Buckles, his glass of beer which was a little over half full. The appellant, when the officers appeared, took a glass of beer from the table, which as a matter of fact had been served to Gonzales, and emptied it in an ash tray. Officer Dunleavy testified that a man by the name of Tom Connolly was in the room when he gave to Officer Buckles the glass of beer and told him to save it as he thought it was doped; that Connolly came over to appellant who was close to the officer and said to her: "Are you sure this guy is all right? She said: 'Sure, I am.' He said: 'He gave the officer the glass of beer.' 'Oh,' she says, 'He is just drunk and he don't know what he is doing. Anyway,' she said, 'that ain't the doped beer; that is Joe's beer.'"

Officer Dunleavy further testified that appellant, noticing that he was not drinking much of his beer, kept urging him to drink up, saying, "Drink up. I don't want to drink alone." He also testified that he saw appellant, by motion, warn a girl, Mary

Beebe, who was sitting on a couch with him, not to drink from his glass. This girl, who was a witness for the prosecution, corroborated this testimony of the officer, testifying as follows:

"*Q.* What did Tazie say, if anything, when this curly haired man on this occasion brought you his drink? * * *

"*A.* She didn't say anything. She just shook her head.

"*Q.* She shook her head at whom?

"*A.* At me.

"*Q.* What were you doing at the time she shook her head at you?

"*A.* Sitting on the couch."

Dunleavy also testified that while he was dancing with appellant:

"Joe [Gonzales] made a motion to drink some of my beer and she [appellant] made a motion to leave it alone."

"*Q.* Did you see her make the motion?

"*A.* I seen her make the motion to leave it alone.

"*Q.* You say Henry made a motion?

"*A.* No, I mean Tazie made a motion for him to leave it down.

"*Q.* For who to leave it down?

"*A.* For Gonzales to leave it down."

The beer which had been furnished Officer Dunleavy and taken from the Mitchell home on analysis showed that in the amount of beer analyzed, which was about a half glass, there were 3.5 grains of chloral hydrate, a hypnotic drug. The chemist testified that there would be about 240 cubic centimeters in an 8 oz. glass and that he examined a hundred centimeters and found it to contain 3½ grains of chloral hydrate.

Dr. Klebba, a witness sworn for plaintiff, testified:

"The physiological action of chloral hydrate when taken internally is to produce sleep and quiet the nervous tension of an individual. * * * After that condition has come on, and if the drug is taken in greater quantities, or in some individuals, in that quantity, it produces a profound sleep which is characterized by a slow breath and they go into a stupor; it is very hard to wake them up. If they don't come out of the stupor, the average result from chloral hydrate in the average case, is either a circulatory disturbance, a cardiac depression or interference with the circulation of the blood, and they die from a respiratory paralysis, paralysis of the nerves which controls respiration."

He further testified this drug should not be administered except by a medical man, it being a drug which should be used with precaution. Further, that the action on the heart in chloral poisoning resembles that of chloroform; that it was dangerous to administer this drug even by a doctor before an examination of the patient.

Dr. Rhoades, a witness sworn for the defendant, on examination by the court testified:

"Q. Do you know what knock-out drops are?
"A. Yes, I do.
"Q. What are they?
"A. Chloral hydrate.
"Q. Is it injurious to give that to a person?
"A. I would say, yes, any hypnotic given to a person without full knowledge· of their constitutional state is injurious."

Dr. Feldman, another witness sworn for defendant, testified that he did not think there would be any ill effect by administering 15 to 20 grains of chloral hydrate to an individual. He further testified that it was a drug that should only be administered under direction of a physician after an ex-

amination of the person to whom it was to be administered.

The only witness sworn for the defense other than two physicians was defendant Henry Mitchell, who testified that Gonzales and the officer came to his home on the evening in question and wanted beer, but were told they had no beer there, and that Gonzales said they would come back later and that Gonzales gave him $2 to buy beer; that later that evening Dunleavy and Gonzales came back and asked for drinks and that he, Mitchell, went to the kitchen to get the beer and was followed into the kitchen by Gonzales who told him that Jimmy, meaning the officer, had a lot of money and he said:

"I hate his guts. I would like to get even with him for something he did to me and my sister. * * * He said: 'Let's get him drunk and get his money.' He says, 'Why don't you put in some of that stuff you use yourself?' I says, 'Well, I might, but I don't think I want to take the chance.' * * * I picked the glasses up and said I guess I will do that. I put a couple of drops, three of them at the most, in one of the glasses and took it in the front room and set them on the window sill and opened the beer and poured the beer out in glasses and set a glass in front of Jimmy and the other one in front of Gonzales and then I went out and got a bottle of beer for myself and a glass of water for my wife.

"Q. The stuff you put in was chloral hydrate?
"A. That's right."

Mitchell further testified that he had used chloral hydrate himself upon several occasions to settle his nerves and that he had never had any bad effects from it. In fact that it soothed his nerves and made him feel like working the next day. Mitchell

insisted that he did not put the chloral hydrate in the beer to injure the officer, but intended to put him to sleep; that he was undecided at the time about taking the officer's money, but admitted that he had made a statement to the officers that he put the chloral hydrate in the beer to make the man sleep and to get his money. Mitchell testified that his wife, Tazie, knew nothing about the chloral hydrate being put in the beer. In fact, so far as he knew, she knew nothing about chloral hydrate and had never put any in anybody's beer to his knowledge.

Appellant's statement of questions involved are 12 in number. Six of which relate to the charge of the court; two to the refusal of the court to charge as requested; one to admission of certain testimony of witness Mary Beebe; one that certain testimony of witness Gonzales, which was stricken by the court, constituted prejudicial error; one in denying defendants' motion for a directed verdict; and one that the verdict was against the weight of evidence.

The two last-mentioned assignments of error can be considered together and disposed of very summarily.

The testimony of defendant Mitchell shows clearly that he placed chloral hydrate in the officer's beer for the purpose of inducing sleep and to enable him to rob the officer; appellant's knowledge of the crime and its intent is inescapable from a review of the record here. Chloral hydrate is a poison and must not be mingled with food or drink with intent to injure. Sufficient chloral hydrate was placed in the beer to induce sleep and stupor on the part of the victim, if he had drunk all of the beer offered, and might have resulted seriously according to the testimony of the doctors. The facts here are almost

identical with those in *People* v. *Adwards*, 5 Mich. 22, where this court said:

"The intent to injure is a necessary ingredient in the crime; it should clearly appear; but the magnitude of the injury, whether it be great or small, is wholly immaterial; nor is it of any consequence one way or the other that the prisoner had a double intent—one, to injure the person, and the other, to obtain his property by stealth, through that injury—if the injury to the person was intended as a means to enable him to effect his ultimate object."

The court did not err in its refusal to direct a verdict for defendants, and surely the verdict was not against the weight of testimony.

The testimony of Mary Beebe that was objected to by counsel for appellant, and the admission of which counsel claims constituted prejudicial error by the trial court, was the following:

"I never talked to Tazie Mitchell or Henry Mitchell about knock-out drops or drugs. They talked with me to a certain extent about it. This was about three weeks before the 16th day of April.

"*Q.* A moment ago when I asked you if you ever had any conversation with Tazie about knock-out drops, you said not exactly about knock-out drops. What did you mean?

"*A.* I just meant she said to me, different fellows, if I ever got any that had any money to bring them up, that I would get my share.

"*Mr. Cornelius:* I move that that be stricken out.

"*The Court:* I think in view of the other testimony, the jury can draw their own conclusion. I will let it stand."

The court properly submitted this testimony to the jury. 3 Comp. Laws 1929, § 17320 (Stat. Ann. § 28.1050); *People* v. *Henssler*, 48 Mich. 49; *People*

v. *Wakely,* 62 Mich. 297; *People* v. *Gengels,* 218 Mich. 632.

This witness Gonzales testified that about a year and a half before the trial, when he was a taxi driver, he had a conversation with appellant to this effect:

"*A.* She told me if I got anybody in my cab that had any money, to bring them over to her place.

"*Q.* Did she or did she not say what she would do?

"*A.* She said she would get their money and give the driver a cut, and she told me to tell the other drivers about it.

"*By the Court:*

"*Q.* Did she say how she would get their money or not?

"*A.* No, sir.

"*Mr. Cornelius:* I object to that testimony and I move it be stricken out from the record as being prejudicial.

"*A.* There was no conversation about knock-out drops.

"*By Mr. O'Connell:*

"*Q.* Was there any conversation along that line at all?

"*A.* Quite a while ago. It is hard to remember.

"*The Court:* He has answered the question. I will strike it out.

"*Q.* Did you ever on any occasion other than that have a conversation with her about knock-out drops?

"*A.* No."

If there was error in the admission of this testimony, it was not prejudicial because when stricken out the error was cured.

"If this claim can be sustained, we are at a loss to know how a trial could be properly conducted. It is manifest that the answer of a witness cannot

be known until it is uttered. If, being incompetent, it is then stricken out, the error is cured, or rather, there is no error. It must be presumed that the jury considers only the testimony admitted by the court to stand. *People* v. *Droste,* 160 Mich. 66, 77.''

Appellant claims error on the part of the trial court in refusing to give the following requested charge to the jury:

''The people must prove beyond a reasonable doubt that the drug administered or mingled with the beverage was a poison and mixed in sufficient quantities to be poisonous in fact to the individual for whom intended and mixed in sufficient quantities with the beverage that the individual for whom intended would suffer injury. These facts you must find beyond a reasonable doubt before you can find the defendants, or either of them, guilty.''

The court on this phase of the case charged the jury as follows:

''There is testimony here that the beer which the officer received was confiscated to make the analysis and from the examination by the chemist found to contain chloral hydrate. Chloral hydrate, according to the testimony, if used in certain doses, may be poisonous, and if used in lesser doses, while not fatal, may be injurious. The defendants, of course, deny that they had any intent to injure this Officer Dunleavy, and the defendant Henry Mitchell says that he put the drug in the beer but he did not intend to injure him; he denies any intention to injure the officer, and denies, as does the defendant Tazie Mitchell, that this substance was poison. You have heard the testimony of the physicians and chemist here for both sides. It is for you to determine whether or not it was a poison, whether or not it was administered by these defendants, or either of them, with intent to injure Officer Dunleavy. Bear in mind it is not necessary to find an intent to do

great, serious, bodily harm; it is sufficient if you find an intent to injure. Putting a man in a stupor, putting him in such a condition that he has lost, temporarily, control of his judgment and reason, may be accomplished by administering this drug in sufficient amounts. You have heard the testimony of Gonzales as to what occurred, and that it is admitted only as having a bearing upon the question of intent on the part of the two defendants. Even if you are satisfied beyond a reasonable doubt that these two defendants, or either of them, administered any poison with intent to injure the day previous, or any time previous, you could not find them guilty unless you are convinced that on the occasion set forth in the information, on the date charged therein, that they administered a poisonous substance with intent to injure, but you have a right to take into consideration what happened, as you get it from the testimony, on the day previous as having a bearing upon the intent of these defendants. By her plea, Tazie Mitchell denies *in toto* she had anything to do with this matter, and the defendant Henry Mitchell denies that he had any intent to injure and he denies that this was a poison.''

There was no error in the refusal of the court to give the charge requested, and the court in his charge clearly stated the principles of law applicable to this branch of the case.

Counsel for appellant is quite insistent that the court erred in his charge to the jury on the question of ''entrapment of defendants by an officer of the law,'' urging that the commission of the crime, if any was committed, was induced by the officers of the law. On this question the court charged the jury as follows:

''Members of the jury, I charge you, as requested: It is against public policy for officers of the

law to induce the commission of criminal offenses. Therefore, when officers of the law, through their acts or conduct, or by what they say, induce or persuade a person to commit a criminal offense, an offender under such circumstances cannot be prosecuted. Therefore, if you find in this case that the officer induced these defendants or either of them to commit the offense charged, or did so through or with the aid of another person by prearrangement, assisting such officers, then your verdict must be not guilty. If there is a reasonable doubt in your minds as to whether or not these defendants did what you find from the evidence they did so [do?], if anything, through the inducement or persuasion of an officer of the law or anyone acting for such officer by agreement or understanding with him, then your verdict must be not guilty.

"Now, members of the jury, there must be an inducement or persuasion. Did this officer induce them to commit a crime? The testimony shows or is to the effect that there was a complaint made to the police about these people, and that the officer went there to find out if the things they claimed or complained about were being done. I think, if I remember the testimony rightly, Gonzales is the one who said he made the complaint. If I am wrong on that, you may correct me. However, Officer Dunleavy testified he went there for that purpose, to catch them if they were doing something contrary to the law. The State claims the officer did not go there to get them to commit a crime; he went there to find out if they were doing the thing complained of, administering what they call knock-out drops, or chloral hydrate. As I told you a little while ago, when the officer went there he did not ask for poison; he didn't ask for chloral hydrate; he asked for beer. It is true he admitted he pretended to be slightly under the influence of liquor. You have heard his testimony he was there to find out if anything was going on, and he ordered beer and he tasted some of the beer, according to his testimony;

he said it tasted bitter. Would you conclude from that that he attempted to persuade them or to induce them? Did he say anything to either of these defendants in the way of inducing them to put chloral hydrate in his beer? If he did, as I told you, your verdict would be not guilty. If he went there and persuaded them or induced them to do that, you can see it would be bad policy for an officer to go out and induce a fellow to do something of this character. The officer said he went there to find out on a citizen's complaint, to see whether that thing was going on, to see if it would be true, and he said it was true; that he was given beer with chloral hydrate, and that he dumped part of it into a little tray, and he put one of these defendants under arrest there because of that. That is his testimony. You can use your own judgment on that story. It is a question for you to answer. There are many cases on record where an officer induced and persuaded one to commit a crime. Maybe this is one of them. There is the testimony of the officer and some of the other witnesses together with the testimony on the part of the defense here, on the part of Henry Mitchell, that the officer did not say anything about putting anything in his beer. As a matter of fact, he testified the officer ordered beer and he said he decided to give him a dose of this chloral hydrate, put some in the beer, and he did put it in. He told you where he had it and why he kept it, and it is for you to consider that testimony, and that his wife didn't know anything about it. I don't think it is necessary for me to go into that any farther. I think you have a very good grasp of the testimony; you have listened very attentively; you know just exactly what the witnesses said, and I am sure you will be well able to decide the guilt or innocence of these defendants.''

There was no error in this charge. It was as favorable to defendants as they were entitled to under the law. In fact the only testimony that

would justify any charge at all on the question of entrapment was that of defendant Henry Mitchell hereinbefore quoted. This testimony was contradicted by Gonzales and it is clearly ascertainable from the record that the jury did not believe defendant Mitchell.

The appellant contends that the court was in error in the following charge to the jury: "The law is, members of the jury, that if one or more persons conspire to commit a crime, the acts of one are chargeable to the other or others as long as those acts come within the scope or purview of the alleged illegal agreement. Where two or more persons work together with one another in the commission of a crime, aiding and abetting one another in the commission of the crime, they are participants, and they share the guilt equally in the crime," for the reason that no conspiracy was charged in the information.

The appellant in her brief admits "That there was evidence in the case from which a conspiracy might have been inferred, and had the information charged conspiracy no objection could have been made to this charge."

It was not necessary in this case to charge conspiracy in the information in order to justify this charge on the part of the court. *People* v. *MacCullough*, 281 Mich. 15.

We have carefully reviewed the record and briefs on the other alleged errors in the court's charge set forth by appellant, and find nothing of sufficient moment to justify further discussion.

The charge as given fully covered every phase of the case and was eminently fair in every respect.

The conviction and sentence are affirmed.

Sharpe, C. J., and Bushnell, Boyles, North, Wiest, and Butzel, JJ., concurred. McAllister, J., took no part in this decision.