# STATE OF MICHIGAN

# COURT OF APPEALS

PEOPLE OF THE STATE OF MICHIGAN,

Plaintiff-Appellee,

v

NADEEM YOUSAF RAJPUT,

Defendant-Appellant.

UNPUBLISHED
October 25, 2018

No. 339117
Wayne Circuit Court
LC No. 16-008073-01-FC

Before: MURRAY, C.J., and BORRELLO and RONAYNE KRAUSE, JJ.

PER CURIAM.

Defendant appeals as of right his jury conviction of second-degree murder, MCL 750.317. The jury acquitted defendant of an original charge of first-degree premeditated murder, MCL 750.316(1)(a), and an additional charge of possession of a firearm during the commission of a felony, MCL 750.227b. The trial court sentenced defendant to a prison term of 46 to 95 years. For the reasons set forth in this opinion, we affirm defendant's conviction and sentence, but we remand this matter for further proceedings regarding the imposition of court costs.

Defendant's conviction arises from events on May 7, 2016, in Detroit, which culminated in the shooting death of Lakisha Henry. That afternoon, Henry was driving a red or burgundy Malibu, with her boyfriend, Dewayne Clay. Defendant was driving a white Infinity that afternoon. Henry's vehicle approached defendant's vehicle as defendant was driving down the street, at which time gunshots were fired from Henry's vehicle toward defendant's vehicle. No one was injured in that shooting.

Defendant was with another man known only as "Haus." Immediately after the shooting, defendant and Haus went to defendant's home, went inside, and left a short time later. After defendant and Haus left defendant's house, they searched for and found the red Malibu involved in the earlier shooting, which Henry was still driving. Henry had dropped Clay off, leaving Henry as the only occupant of her vehicle. Witnesses observed defendant's vehicle chasing after Henry's vehicle, eventually trapping it at a location where Henry's vehicle became blocked. Defendant and Haus then approached Henry's car on foot. After a brief argument, multiple gunshots were fired, ending in Henry's death. The identity of the shooter was a disputed issue at trial. The prosecution's theory at trial was that defendant either shot Henry himself, or aided and abetted Haus in shooting her. Defendant testified at trial and claimed that he approached Henry only to find out who had shot at him. He denied being armed with a gun. Defendant claimed

-1-

that Henry grabbed for a gun from the passenger seat of her car, after which Haus reacted by removing a gun from his waistband and shooting Henry.

## I. SELF-DEFENSE INSTRUCTION

We first address defendant's claim that the trial court erred by denying his request to instruct the jury on self-defense. A claim of instructional error involving a question of law is reviewed de novo, but the trial court's determination regarding the application of a jury instruction to the facts of the case is reviewed for an abuse of discretion. *People v Mitchell*, 301 Mich App 282, 286; 835 NW2d 615 (2013). "An abuse of discretion occurs when the court chooses an outcome that falls outside the range of reasonable and principled outcomes." *People v Guajardo*, 300 Mich App 26, 34; 832 NW2d 409 (2013) (quotation marks and citation omitted).

"A defendant in a criminal trial is entitled to have a properly instructed jury consider the evidence against him or her." *People v Dobek*, 274 Mich App 58, 82; 732 NW2d 546 (2007). It is the responsibility of the trial court to "clearly present the case to the jury and to instruct it on the applicable law." *Id*. "Jury instructions must include all the elements of the offenses charged against the defendant and any material issues, defenses, and theories that are supported by the evidence." *Id*. However, a "defendant asserting an affirmative defense must produce some evidence on all elements of the defense before the trial court is required to instruct the jury regarding the affirmative defense." *Guajardo*, 300 Mich App at 34-35 (quotation marks and citation omitted). "An affirmative defense is one that admits the doing of the act charged, but seeks to justify, excuse, or mitigate it . . . . It does not negate selected elements or facts of the crime." *Id*. at 35 n 1 (quotation marks and citation omitted; ellipsis in original). "Jury instructions are reviewed in their entirety, and there is no error requiring reversal if the instructions sufficiently protected the rights of the defendant and fairly presented the triable issues to the jury." *Dobek*, 274 Mich App at 82.

With respect to self-defense, the contours of this affirmative defense are defined by reference to both the common law and statutory authority. As this Court has previously explained:

> Under the common law, the affirmative defense of self-defense justified the killing of another person if the defendant " 'honestly and reasonably believes his life is in imminent danger or that there is a threat of serious bodily harm and that it is necessary to exercise deadly force to prevent such harm to himself.' " In general, a defendant does not act in justifiable self-defense when he or she uses excessive force or when the defendant is the initial aggressor.

> In 2006, the Legislature enacted the Self–Defense Act (SDA), MCL 780.971 *et seq*. Effective October 1, 2006, the SDA "codified the circumstances in which a person may use deadly force in self-defense or in defense of another person without having the duty to retreat." Specifically, the SDA modified the common law's duty to retreat that was imposed on individuals who were attacked outside their own home or were not subjected to a "sudden, fierce, and violent" attack. However, the SDA continues to require that a person have an honest and

-2-

reasonable belief that there is a danger of death, great bodily harm, or a sexual assault in order to justify the use of deadly force. MCL 780.972(1). [*Guajardo*, 300 Mich App at 35-36 (some citations omitted).]

Section 2 of the SDA provides in pertinent part as follows:

(1) An individual who has not or is not engaged in the commission of a crime at the time he or she uses deadly force may use deadly force against another individual anywhere he or she has the legal right to be with no duty to retreat if . . . .

(a) The individual honestly and reasonably believes that the use of deadly force is necessary to prevent the imminent death of or imminent great bodily harm to himself or herself or to another individual. [MCL 780.972(1)(a).]

Section 4 of the SDA provides:

This act does not diminish an individual's right to use deadly force or force other than deadly force in self-defense or defense of another individual as provided by the common law of this state in existence on October 1, 2006. [MCL 780.974.]

Turning to defendant's argument on appeal, we initially note that defendant, as did the trial court, incorrectly focuses on whether his claim that Haus shot the victim in self-defense precluded defendant from being entitled to an instruction on self-defense as a matter of law. Although the defense theory at trial was that Haus shot Henry, the prosecution argued that defendant could still be guilty under an aiding-and-abetting theory even if defendant was not the actual shooter. In *People v Johnson*, 116 Mich App 452, 456, 459; 323 NW2d 439 (1982), remanded on other grounds sub nom by *People v Taylor*, 422 Mich 554 (1985), the defendant argued that a new trial was warranted based on newly discovered evidence that another individual, who arrived with the defendant at the party where the shooting occurred, actually shot the victim in self-defense. This Court noted in its analysis that "[i]t is true that if an attack by a principal is justified by self-defense both the principal and the aider and abettor are relieved from liability." *Id.* at 459, citing *People v Pearce*, 369 Mich 692; 120 NW2d 838 (1963). This Court ultimately concluded, however, that the defense of self-defense was not available to the defendant or his companions because they were the aggressors, having arrived at the party "wielding guns and making threatening demands." *Johnson*, 116 Mich App at 459.

In *Pearce*, 369 Mich at 693, which this Court cited in *Johnson*, the appellant and his codefendant had been involved in an altercation with a group of men, during which the codefendant fatally stabbed the victim. At their joint trial, the codefendant had claimed that he had acted in self-defense. *Id.* at 693, 695. The appellant and the codefendant were subsequently convicted of second-degree murder. *Id.* at 693. On appeal, our Supreme Court reversed the appellant's conviction and remanded for a new trial, holding in relevant part that "the jury should have been instructed to acquit him . . . if it found that [the codefendant] struck the fatal blow in his own self-defense." *Id.* at 695.

In light of *Johnson* and *Pearce*, defendant's claim that Haus was the shooter who acted in self-defense did not preclude an instruction on self-defense if the evidence otherwise supported the instruction. *Pearce*, 369 Mich at 695; *Johnson*, 116 Mich App at 459. The trial court's reliance on *People v Droste*, 160 Mich 66, 80; 125 NW 87 (1910), to support its denial of the self-defense instruction was misplaced. Although the defendant in *Droste*, did claim that somebody else delivered the fatal blow, the defendant in that case did not claim that he or the alleged actual attacker acted in self-defense; there was simply no claim of self-defense made at the trial. *Id*. In contrast, defendant in this case was not simply claiming that somebody else shot Henry; his theory at trial was that Haus shot Henry in self-defense.

Regardless, the real issue with respect to defendant's self-defense argument is whether defendant and Haus were the initial aggressors in the incident that resulted in Henry's death. As previously noted, a defendant generally cannot claim to have acted in justifiable self-defense if the defendant was the initial aggressor. *Guajardo*, 300 Mich App at 35. Furthermore, even an "aggressor in a chance-medley (an ordinary fist fight, or other nondeadly encounter) who finds that his adversary has suddenly and unexpectedly changed the nature of the contest and is resorting to deadly force . . . must not resort to deadly force if there is any other reasonable method of saving himself." *People v Reese*, 491 Mich 127, 158; 815 NW2d 85 (2012) (quotation marks and citation omitted; ellipsis in original).

In this case, there was evidence (including defendant's own testimony) that defendant was able to get away and safely return to his home following the earlier shooting of defendant's vehicle. Henry's vehicle had driven away. Shortly thereafter, according to defendant, he and Haus left defendant's home for the purpose of finding out who had shot at him. They saw the red Malibu that was involved in the earlier shooting parked in front of a house, and one or two individuals got out and ran into the house. Then the red Malibu, which Henry was driving, sped off. Defendant and Haus gave chase. The vehicles were traveling at a high rate of speed through a residential neighborhood, and both vehicles ran a stop sign before coming to an abrupt halt. According to one witness, defendant's vehicle sideswiped Henry's vehicle once it caught up to Henry's vehicle. Defendant testified that Henry's vehicle came to a stop behind another vehicle and that she could not go forward at that point.

Defendant and Haus got out of the vehicle and approached Henry's vehicle. Haus had his gun tucked in his waistband. Defendant stood by the driver's side mirror of Henry's car, and Haus was standing to defendant's left. Henry's driver's side window was down a few inches, and a loud argument began. Defendant testified that he said, "who were the [ ] of the people shooting at me and why are they trying to kill me[?]" After Henry responded that she did not know, defendant said in a louder voice, "who the [ ] were the people shooting at me and why the [ ] do they want to kill me[?]" According to defendant, Henry seemed "[e]rratic" and "scared." Defendant further testified that Henry "said that she was scared and she didn't want to die." Defendant told her that he was not there to hurt her and just wanted to "find out who these people were." Then, according to defendant, Henry reached for a gun in the passenger seat. Defendant and Haus "kind of both jumped back," and Haus pulled out his gun and shot at Henry's vehicle "five or six times." Another witness described seeing gunfire coming out of the passenger window of defendant's car when the two cars were parked in the street. After the shooting, defendant and Haus got back into defendant's vehicle and left.

It is clear from defendant's own testimony that after the first shooting incident had concluded in defendant's escape to the safety of his own home where he was no longer under attack, defendant then left his home and intentionally reinitiated contact with Henry. Defendant and Haus actively searched for Henry's vehicle, pursued her in a high-speed chase until she was cornered, and confronted her in such a manner that she responded by indicating that she was scared and did not want to die. Only at that point, did she apparently reach for a gun before being shot. Therefore, defendant and Haus were the initial aggressors in the incident that resulted in Henry's death. See *Guarjardo*, 300 Mich App at 41-42 (concluding that the defendant was the initial aggressor and not entitled to a self-defense instruction where the defendant pursued the victim to the victim's room after the victim had abandoned an earlier physical altercation, convinced the victim to open the door by offering him food, and then shot the victim). Because defendant and Haus were the initial aggressors, the attack on Henry cannot be considered justifiable self-defense. *Guajardo*, 300 Mich App at 35. Even if we assume that the encounter initiated by defendant and Haus began as a nondeadly one but was escalated in nature by Henry's attempt to grab a gun, there still was no justification for responding with deadly force directed at Henry because defendant and Haus could have fled. *Reese*, 491 Mich at 158. Therefore, the trial court did not err by declining to instruct the jury on self-defense. "This Court will affirm a lower court's ruling when the court reaches the right result, albeit for the wrong reason." *People v Lyon*, 227 Mich App 599, 612-613; 577 NW2d 124 (1998).

## II. PIERRE CARR'S PRIOR TESTIMONY

We next address defendant's argument that the trial court erred by denying his request to introduce a portion of the testimony given by Clay's brother, Pierre Carr, pursuant to an investigative subpoena. The parties agreed at trial that Carr was unavailable as a witness. Defendant sought to admit Carr's testimony regarding statements he apparently heard Clay make to Henry over the telephone as she was being chased by defendant and Haus. Defense counsel's proffer indicated that Carr testified that Clay told Henry to "shoot them." The trial court ruled that Carr's testimony was inadmissible, although the trial court's reasoning was somewhat opaque. It appears that the trial court concluded that the testimony was inadmissible because the trial court believed that Carr's prior testimony was untrustworthy and unreliable, and accordingly, had "no probative value."

A trial court's evidentiary decisions are reviewed for an abuse of discretion, but any preliminary questions of law, such as whether a rule of evidence precludes admissibility, are reviewed de novo. *People v Chelmicki*, 305 Mich App 58, 62; 850 NW2d 612 (2014). "The trial court abuses its discretion when its decision is outside the range of principled outcomes." *People v King*, 297 Mich App 465, 472; 824 NW2d 258 (2012).

On appeal, as was the case in the trial court, defendant fails to recognize that the statements he sought to introduce—Carr's testimony about what he heard Clay say—constituted hearsay within hearsay because each statement was made by the two separate declarants at a time other than during testimony at the instant trial and was offered by defendant to prove the truth of the matter asserted, i.e., that Carr said that Clay told Henry to "shoot." MRE 801(c) (defining hearsay as "a statement, other than the one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted"). Accordingly, for these statements to have been admissible, both layers of hearsay would need to fit within an exception

to the general prohibition on hearsay. MRE 802; MRE 805. But defendant, while generally referring to Clay's statement as an excited utterance without any further analysis or acknowledgment of the hearsay-within-hearsay rule contained in MRE 805, focuses his appellate argument entirely on whether Carr's testimony given pursuant to an investigative subpoena was admissible as former testimony under MRE 804(b)(1).

Nonetheless, assuming without deciding that neither of the statements at issue were barred from admission by the rule against hearsay, the statements were not relevant to defendant's claim of self-defense and defendant therefore has not demonstrated on appeal that the statements at issue should have been admitted into evidence. In other words, the fact that testimony is not inadmissible hearsay does not necessarily make the evidence admissible because the fact that testimony is not inadmissible hearsay does not necessarily make that evidence *relevant*. Logical relevance is the "touchstone of admissibility." *King*, 297 Mich App at 476. "Evidence which is not relevant is not admissible." MRE 402. Evidence is relevant if it has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." MRE 401.

In this case, even if Clay told Henry to shoot at defendant, that does not make it any more or less likely that Henry actually shot at defendant. Moreover, even if Henry did shoot at defendant, the evidence established that defendant and Haus had purposely set out to track down Henry's vehicle, that they eventually located Henry's vehicle, and that they subsequently pursued Henry's vehicle in a high-speed chase. Defendant testified that Henry reached for a gun while defendant and Haus were standing outside Henry's vehicle and that Haus responded by shooting at Henry. This was the evidence that defendant relied on to establish his claim of self-defense, and her act did not depend on whether she was told by Clay to take such an action. Yet, as previously discussed, because defendant and Haus were the initial aggressors in pursuing Henry, defendant was not justified in responding with deadly force even if we assume that Henry actually fired a gun at defendant at some point during the incident. Therefore, the statements of Carr and Clay were not relevant to defendant's claim of self-defense because they did not make any fact more or less probable that would have shown that defendant was entitled to make a claim of justifiable self-defense. MRE 401. To the extent that the trial court's reasoning for concluding that this evidence was inadmissible differs from ours, a trial court's error in admitting or excluding evidence will not be reversed if the court reached the right result, albeit for the wrong reason. *People v Brownridge*, 459 Mich 456, 462-463; 591 NW2d 26 (1999), amended on other grounds 459 Mich 1276 (1999).

### III. SENTENCING GUIDELINES DEPARTURE

Next, defendant argues that the trial court abused its discretion when it departed from the sentencing guidelines range of 225 to 375 months and instead sentenced him to a prison term of 46 to 95 years for his murder conviction.

We review a defendant's sentence on appeal for reasonableness under an abuse of discretion standard. *People v Steanhouse*, 500 Mich 453, 471; 902 NW2d 327 (2017). "[T]he proper inquiry when reviewing a sentence for reasonableness is whether the trial court abused its discretion by violating the 'principle of proportionality' set forth in *People v Milbourn*, 435 Mich 630, 636; 461 NW2d 1 (1990), 'which requires sentences imposed by the trial court to be

proportionate to the seriousness of the circumstances surrounding the offense and the offender.' " *Steanhouse*, 500 Mich at 459-460.

Although the sentencing guidelines are advisory, sentencing courts are still required to consult and account for the applicable guidelines range when imposing a sentence. *Steanhouse*, 500 Mich at 470. There is no requirement for sentencing courts to articulate a substantial and compelling reason to impose a sentence that departs from the guidelines range, *People v Lockridge*, 498 Mich 358, 364-365; 870 NW2d 502 (2015), but sentencing courts must still justify the imposed sentence for purposes of facilitating appellate review, *Steanhouse*, 500 Mich at 470. Accordingly, "the key test is whether the sentence is proportionate to the seriousness of the matter, not whether it departs from or adheres to the guidelines' recommended range." *Id*. at 475 (quotation marks and citation omitted).

The principle of proportionality requires a sentencing court to consider the nature of the offense and the background of the offender when fashioning an appropriate sentence. *Id*. at 472. Factors that courts have considered in applying the proportionality standard include the following:

> (1) the seriousness of the offense; (2) factors that were inadequately considered by the guidelines; and (3) factors not considered by the guidelines, such as the relationship between the victim and the aggressor, the defendant's misconduct while in custody, the defendant's expressions of remorse, and the defendant's potential for rehabilitation. [*People v Lawhorn*, 320 Mich App 194, 207; 907 NW2d 832 (2017) (quotation marks and citation omitted).]

In this case, defendant essentially argues that the trial court did not cite appropriate reasons for exceeding the guidelines. First, he contends that the trial court's reference to his lack of remorse was based on mere speculation. A lack of remorse is a proper consideration at sentencing. *Id*. When defendant allocated at sentencing, he briefly indicated that he was remorseful for Henry's family. The trial court acknowledged that defendant had expressed remorse but stated that it did not believe that defendant was truly remorseful. Contrary to what defendant argues, the court did not fail to specify the basis for its belief that defendant was not remorseful, because the court explained that its opinion was based on its observations of defendant's conduct throughout the proceedings.

Defendant also argues that the trial court ignored the jury's verdict, and improperly sentenced him as if he was guilty of first-degree premeditated murder. We disagree. The court was aware that the jury convicted defendant of second-degree murder. It stated that it "ha[d] to respect the jury's decision" and that it was required to "make a decision based upon the verdict that the jury reached," but it further stated that it was entitled to look at the evidence that was presented and draw conclusions from the evidence. The court commented that the jury's verdict may have been a compromise, but that the evidence showed that defendant "went to the house, got the gun, left and went scouring the streets until [he] found the people who were shooting at [him] and then fire was returned." The court stated that it was logical to conclude that "someone who makes a conscious decision to go and arm themselves with a weapon and then go hunting down the person who was after them is someone who is thinking about what they're doing."

At sentencing, a trial court may consider conduct for which the defendant was acquitted if the court's findings are supported by a preponderance of the evidence. *People v Ewing (After Remand)*, 435 Mich 443, 449-451, 453-454; 458 NW2d 880 (1990) (opinion by BRICKLEY, J.); *Id*. at 472-473, 479 (opinion by BOYLE, J.); *People v Granderson*, 212 Mich App 673, 678-679; 538 NW2d 471 (1995). In this case, the trial court's comments indicate that it understood that the jury acquitted defendant of first-degree murder, but that a preponderance of the evidence at trial showed that defendant responded to the first shooting by leaving his house with Haus while armed with a gun, deliberately searching for the red Malibu, and shooting Henry after she begged for her life. The evidence introduced at trial supported the trial court's conclusion that defendant's purposeful conduct leading up to Henry's death enhanced the seriousness of the offense in a manner not adequately contemplated by the guidelines, even if the jury acquitted defendant of first-degree murder. *Granderson*, 212 Mich App at 678-679; see also *People v Gould*, 225 Mich App 79, 89; 570 NW2d 140 (1997) ("[A] trial court may consider the evidence admitted at trial as an aggravating factor in determining the appropriate sentence.").

Defendant also argues that his criminal history did not support the trial court's conclusion that he was unlikely to be rehabilitated. The trial court commented on defendant's "violent criminal history," which included assault and battery, and assault with a dangerous weapon. The trial court also found that defendant's criminal record demonstrated an escalating pattern of violence, making him "a great danger to society," who was not likely to be rehabilitated. The court noted that, in this case, Henry was shot in cold blood after she begged for her life. Although Henry was not entirely blameless, the evidence supports the trial court's finding that she was helpless when defendant and Haus confronted her after trapping her vehicle; even defendant admitted in his testimony that Henry pleaded with him not to shoot her and that she said that she did not want to die.

According to the Presentence Investigation Report, defendant was on probation at the time of the offense based on Florida convictions for two counts of third-degree child abuse, assault and battery, assault with a dangerous weapon, and breaking and entering. Defendant's Florida convictions were not scored under prior record variable (PRV) 2, prior low severity felony convictions. MCL 777.52. Indeed, defendant received zero points for PRV 2, although he had multiple prior felony convictions. Although defendant's pattern of criminal behavior was considered for purposes of scoring offense variable (OV) 13, MCL 777.43, for which defendant received 25 points, defendant's PRV total was only 15 points, despite his extensive prior record.[1] Therefore, the guidelines did not accurately reflect defendant's background with respect to his criminal record. *Steanhouse*, 500 Mich at 472.

In sum, considering the aggravating circumstances surrounding the instant offense, as well as defendant's history of escalating criminal conduct, the trial court's departure sentence qualifies as proportionate to the seriousness of the offense and the offender. Accordingly, the

---

[1] We also note that the fact that defendant was on probation was accounted for under PRV 6, MCL 777.56, although his Florida convictions that resulted in his being on probation were not accounted for under PRV 2.

trial court did not abuse its discretion by exceeding the guidelines and sentencing defendant to 46 to 95 years in prison.[2] *Steanhouse*, 500 Mich at 459-460.

## IV. COURT COSTS

Defendant also argues, and the prosecutor concedes on appeal that pursuant to *People v Konopka (On Remand)*, 309 Mich App 345, 350-351, 359-360; 869 NW2d 651 (2015), this case should be remanded for a determination of the factual basis for the trial court's assessment of $1,300 in court costs. We agree. Accordingly, we remand for that purpose.[3]

We affirm defendant's conviction and sentence, but remand for determination of the factual basis for the costs imposed. We do not retain jurisdiction.

/s/ Christopher M. Murray
/s/ Stephen L. Borrello
/s/ Amy Ronayne Krause

---

[2] We also note that the instant case, contrary to defendant's assertion, is not a situation like the one in *People v Dixon-Bey*, 321 Mich App 490, 525-526; 909 NW2d 458 (2017), because the defendant in that case had no violent criminal history to provide the trial court with a basis for concluding the defendant was a recidivist criminal. *Dixon-Bey* is further distinguishable from the instant case because the trial court in this case adequately explained its reasons for concluding that an upward departure sentence was warranted, including the fact that Henry was killed after defendant purposefully hunted for her. See *id*. at 525-529. The trial court's reasoning in this case, as described above, were proper factors to consider in determining a proportionate sentence. *Lawhorn*, 320 Mich App at 207.

[3] Although the prosecution acknowledges that *Konopka* is binding under MCR 7.215(J)(1), it argues that *Konopka* was wrongly decided. However, we decline plaintiff's request to declare a conflict under MCR 7.215(J)(2) because we do not disagree with that decision.