## THE PEOPLE v. AUGUST WOLF.

*Homicide—Proof of intent—Evidence.*

1. Where in a homicide case the people prove that the fatal wounds were inflicted by the respondent with a deadly weapon, and that they caused instant death, the intent to take life is clearly inferable, in the absence of any explanatory circumstances, which it is incumbent upon the respondent to show in order to relieve himself of the consequences of his act; citing *People v. Miller*, 91 Mich. 644.

2. Where the respondent in a homicide case testifies that the murder was committed by a stranger, who attacked the deceased just after he had finished filing a cross-cut saw, the testimony of a witness for the people that he examined the saw the day after the murder, and from the appearance of the teeth he could tell whether they were newly filed or not, and that two or three had been newly filed, and that the rest were dull, is admissible.

Error to Ontonagon. (Stone, J., presiding.) Argued April 21, 1893. Decided June 1, 1893.

Respondent was convicted of murder in the first degree, and sentenced to imprisonment in the State prison for life. Judgment affirmed. The facts are stated in the opinion.

*R. C. Flannigan,* for respondent.

*A. A. Ellis,* Attorney General, and *W. W. Wendell,* Prosecuting Attorney, for the people.

GRANT, J. The respondent was convicted of murder in the first degree. The name of the murdered man was August Smith. Wolf had been employed by one Kleinlein, who had located a homestead in Ontonagon county, to clear some land at an agreed price per acre. April 5 he employed Smith to work with him. Smith worked there

95 MICH.—40.

until he was killed, April 14. They boarded at Kleinlein's. On the morning of the 14th they went to work about 7 o'clock, about four rods from the house. Between 9 and 10 o'clock they moved to a point about 12 rods from the house, where they could not be seen from the house. Mrs. Kleinlein and her children were alone. About 11 o'clock she heard a scream down where Wolf and Smith were at work. A few minutes after she heard another, which lasted several minutes. Before she heard the screaming she saw Wolf carrying his coat and an iron wedge from the place where they were first at work towards the place where Smith was murdered, and afterwards saw him going in the same direction, with a shovel upon his shoulder. Shortly before 12 o'clock Wolf came into the house. He had a cut upon his forehead, and both his hands were cut and bleeding. He said that his hand was pinched between the tree and the saw, and that Smith had left him, and run away, and that a limb from a tree struck him on the forehead. There was blood on his shirt in front, on one sleeve of his shirt, and on the sleeves of his coat. She dressed his wounds, after which he went to a neighbor's, Mr. Brown, and returned in about a quarter of an hour. He then ate his dinner, and returned, apparently, to his work. He repeated the story to her while in the house. He was trembling while eating. About 2 o'clock she went out after the shovel. She saw blood spots, and called his attention to them. She asked where the stump was where he was pinched. He showed it to her. There was blood on the stump, and on the slivers that stood up out of the stump, and on the butt end of the tree. She remarked that it was not very much, to which he replied, "The sap on the tree washed it off." She asked him how he could get his fingers pinched there. He replied that he had his fingers loose, and the tree fell over, the slivers

caught his fingers and fastened them, and when he began to pull it hurt him so awfully that it made him scream. It was impossible for his hand to have been caught in the manner stated, and the entire statement was a pure fabrication. She 'wondered what made Smith run away. Wolf said he didn't know; all he could remember he looked as white as snow. Wolf then went to the house with her, and when she next saw him he was coming towards the house with Mr. Brown and two men by the name of Manning. He told Brown and the Mannings substantially the same story that he had told Mrs. Kleinlein, though differing in some particulars. He went away that evening, saying that if he did not come home that night they need not wait for him; he would be back the next day. He did not return, however, and was afterwards arrested in Warsaw, Wis., about 300 miles from the scene of the murder.

Before his arrest the officer asked him when he was in Michigan, and he replied, "Some time ago." On being asked if he was at Bruce's crossing on the 14th he hesitated, but finally said, "Yes." He said he knew Smith, and had worked at Kleinlein's with him. The next morning he said that Smith was at Warsaw, and, being asked why he did not say so the night before, he made no reply. When arrested he had only a dollar bill and a copper coin upon his person.

The next day after Wolf left, suspicion being aroused, search was instituted. A few feet from the stump on which blood was found was a pile of brush. The brush was removed, and underneath was found a pool of blood. A few feet from this pile was another, and blood stains were found underneath it. About 10 feet from this second pile was another, on removing which they found blood stains and snow and sand mixed. There Smith's body was found, buried under about a foot and a half of snow and dirt. The face was very much discolored around

the eyes. The entire portion of the occipital bone was cut off, exposing the brain, and was held by a piece of the skin at the top of the head. There was a cut in the back between the shoulder blades an inch and a half in length. There were three blows upon the left side of the face, evidently made with an axe transversely across the lip. One of these wounds extended along the neck, and reached the spinal column, but did not sever it. The physician testified that these wounds would have caused instant death. When the wounds were made upon the face the deceased was evidently lying on his back. The blow which cut the occipital bone was evidently made while he was prostrate, and lying upon his side.

Mrs. Kleinlein, under objection and exception by respondent's counsel, testified that about a couple of weeks before the murder Wolf said that he "must hustle up to get some money; that he was going to get married; that one month's wages would take him to buy his sweetheart some clothes, and another month's work would buy him some clothes." On the day of the murder, while eating dinner, Mrs. Kleinlein said to Wolf: "I wonder if Smith has his dinner. Perhaps the poor man ain't got any money, and he run a long while without anything to do." Wolf replied: "He has his dinner on the crossing. He got money on the crossing."

After his arrest, Wolf wrote a long letter, detailing the circumstances of the killing of Smith, and charging that it was done by a stranger, in his presence; that the stranger spared his life only upon condition that he would leave the State within 24 hours, and stay away 10 days, after which he might return and tell everything; that he told the stranger that he did not have money enough to get out of the State so quick; that he had $11 belonging to Smith, and he did not want to keep it; that he then took the money that Smith had given him, put it on the stump,

and told the stranger to give it to Smith; that the stranger took the money, put it in his pocket, and then gave Wolf $15.

The circuit court very fully and carefully instructed the jury as to what constitutes murder in the first and second degrees and manslaughter.

1. The learned counsel for the respondent contends that there was no evidence to sustain the verdict, because there was no proof of previous deliberation or premeditation. This would result in holding that deliberation and premeditation cannot be inferred from the character of the weapon used, the wounds inflicted upon vital parts, the circumstances surrounding the killing, the acts, conduct, and language of the accused before and after the killing, and the improbability of the story told by him. According to respondent's own story, a most brutal murder had been committed in his presence by a stranger whom no one else had ever seen in the vicinity. The jury evidently believed his story incredible. If the accused committed the deed, the facts were sufficient to justify the verdict.

2. Error is assigned upon the following portion of the charge:

"In some instances proof of the intent is furnished by the manner of the killing itself; as when the murder is shown to have been committed with a deadly weapon, or a dangerous weapon, in such a manner that an inquiring mind can come to no other conclusion than that the death of the victim was intended. Thus, if one man shoot another through the head with a musket or pistol ball, or if he is stabbed in a vital part with a saber, or if he cleave his skull with an axe, or the like, it is almost impossible for a reflecting or intelligent mind to come to any other conclusion than that the perpetrator of such an act of deadly violence intended to kill. In such case the law presumes every person to intend the usual consequences which accompany the use of the means employed in the manner employed, and casts upon

the accused the burden of showing that the intention in using the weapon was harmless, or not murderous."

Immediately following the above the court said:

" The mere proof of the murder itself, without other proof deduced from the manner of the killing, or from other evidence tending to establish the design to take the life of the victim, would not establish the higher degree of the crime, but would only authorize a verdict of murder in the second degree."

The language complained of was quoted *verbatim* from *People v. Potter*, 5 Mich. 8. The court, in that part of the charge, was instructing the jury as to those acts from which the intent is to be implied. The burden of proving his innocence was not, by this charge, placed upon the accused. When the people rest their case in a criminal prosecution, they must make a case of guilt beyond a reasonable doubt. In this case the prosecution proved the use of a lethal weapon with which the wounds were inflicted, causing instant death, and that they were inflicted by the accused. From these facts the intent to take life was clearly inferable, in the absence of any explanatory circumstances. In such case it is incumbent upon the accused to make the explanation which will relieve him of the consequences of his act. *People v. Miller*, 91 Mich. 644. Subsequently in its charge the court told the jury that it was the duty of the people to prove beyond a reasonable doubt every fact essential to make out the guilt of the accused, and that the facts must be inconsistent with any theory except that of guilt; and further told them that they must consider the whole evidence in determining the reasonable doubt. We find no error in the charge.

3. The testimony of Mrs. Kleinlein in regard to her conversation with Wolf about money was competent. We cannot say, as a matter of law, that it had no bearing upon the motive for the murder. It may have been weak, but

it was for the jury to determine what weight they would attach to it.

4. The respondent testified that, when the stranger attacked Smith, Smith had just finished filing the cross-cut saw at a stump. One Leo Gleisnar testified that on the day following the murder he was present when the body of Smith was found; that he examined the saw; that two or three teeth were newly filed, and one tooth had two or three strokes of the file upon it, and that the rest of the teeth were dull. On cross-examination the witness said that if the saw had been used between the time that Smith was killed and the time he saw it the marks of filing would have been obliterated. Counsel for the respondent then moved to strike out the testimony of this witness in regard to the filing of the saw. The court then said:.

"He should only speak of the appearance of it."

Respondent's counsel then asked the witness the question:

"Q. You only know what the appearance was, I suppose. "A. Yes, sir; I can tell the teeth of a saw,—whether they were newly filed or whether they were not. Three or four of them had been just filed, and had not been used."

The court thereupon refused to strike out the testimony. It is evident from the record that the reason now urged against this testimony was not raised upon the trial. But, aside from this, we think the objection is without merit. The fair inference from the evidence is that the saw had not been used from the time Smith was killed until it was examined by the witness.

We find no error upon the record, and the judgment is affirmed.

The other Justices concurred.