# STATE OF MICHIGAN

# COURT OF APPEALS

PEOPLE OF THE STATE OF MICHIGAN,

        Plaintiff-Appellee,

v

MONTEZ MAXWELL,

        Defendant-Appellant.

UNPUBLISHED
November 27, 2018

No. 337905
Wayne Circuit Court
LC No. 16-008074-01-FC

PEOPLE OF THE STATE OF MICHIGAN,

        Plaintiff-Appellee,

v

VICTORIA LYNN SOLOMON,

        Defendant-Appellant.

No. 342169
Wayne Circuit Court
LC No. 16-006414-01-FC

Before: M. J. KELLY, P.J., and SAWYER and MARKEY, JJ.

PER CURIAM.

Defendants, Montez Maxwell and Victoria Lynn Solomon, were tried jointly, but before separate juries, for the murder of Tyrone Delaney. In Docket No. 337905, Maxwell appeals as of right his convictions of first-degree premeditated murder, MCL 750.316, and possession of a firearm during the commission of a felony (felony-firearm), MCL 750.227b. Maxwell was sentenced to life in prison without the possibility of parole for murder, to be served consecutive to a two-year sentence for felony-firearm. In Docket No. 342169, Solomon appeals by leave granted[1] her conviction of first-degree premeditated murder.[2] Solomon was sentenced to life in

---

[1] *People v Solomon*, unpublished order of the Court of Appeals, entered May 18, 2018 (Docket No. 342169). Solomon did not timely file an appeal as of right, but this Court granted her

prison without the possibility of parole. We affirm Maxwell's and Solomon's convictions and sentences.

## I. FACTS

Delaney fathered three of Solomon's children. Testimony at trial explained that Solomon and Delaney had an off-and-on relationship over a period of several years. The relationship was abusive, and Delaney had received two misdemeanor convictions, in 2009 and 2010, for assaulting Solomon. Nonetheless, testimony presented at trial indicated that Solomon frequently took all six of her children to the home of Kalua Hudson, who is Delaney's mother, to feed and bathe them. Solomon was comfortable leaving her children with Hudson and her family. A few days before the murder, Solomon had brought Delaney's children to visit with him at Hudson's home. For reasons discussed in more detail later in this opinion, Delaney had been absent for some time, and had recently begun living at Hudson's home at the time of his death.

In the afternoon of June 21, 2016, one of Delaney's sisters, Tanysha Black (Tanysha), picked up Solomon and her children. Plans had been made for Delaney to have his two youngest children, approximately 1-year-old twins, stay overnight at Hudson's home. When Tanysha brought Solomon to Hudson's home, there was no animosity; in fact, Solomon, Delaney, and others sat together for about half an hour before Tanysha drove Solomon and her other children to a restaurant. But while Solomon was at Hudson's home, she asked Tanysha to retrieve Solomon's purse. Solomon explained that she had a handgun in her purse, and did not want the children to find it. Solomon did not explain why she had the gun with her. Tanysha retrieved the purse and saw the gun, which she described as a black and chrome .38 caliber handgun.

During the evening and into the night, Solomon and Delaney argued via telephone and text message. It appears that the primary issue was Delaney's complaint that Solomon did not provide enough diapers for the children when she dropped them off with him. Eventually, Solomon grew frustrated and demanded that her children be returned to her. Delaney refused, explaining that it was too late at night for Solomon to get the children, who were asleep. Solomon was not satisfied, and began calling friends and family members, looking for someone to drive her to Hudson's home. During these calls, Solomon began threatening to kill Delaney if he did not return the children.

At the time, Solomon was dating and living with Maxwell. Using information regarding what towers their respective cellular telephones were interacting with during the relevant timeframe, it appears that Solomon and Maxwell traveled to Hudson's home between 1:00 a.m. and 1:30 a.m. on June 22, 2016. Tameka Black (Tameka), another of Delaney's siblings, was at Hudson's home because Delaney had asked her to bring diapers. Tameka explained that she saw

---

application for a delayed appeal. *Id*. This Court consolidated the two appeals in the same order. *Id*.

[2] Solomon was found not guilty of felony-firearm.

Delaney walk out of the home and head in an unexpected direction. This drew Tameka outside, who saw that Solomon was standing outside the home.

Delaney and Solomon had a verbal argument over the children. During this argument, Solomon spat on Delaney, and Delaney slapped Solomon. Hudson was called outside, and was seemingly able to calm the situation to some extent. But as Delaney was beginning to walk away, Solomon made a threat, stating, "I'm going to get somebody to shoot you." Solomon took her cellular telephone out and said something that went unheard by the witnesses. However, Delaney responded by stating, "Oh, b****, you're still throwing threats at me." He approached Solomon and slapped her a second time. Hudson again intervened, however, telling Delaney to stop, which he did.

According to Tameka, Solomon then began backing away from Delaney, seemingly leading him toward the nearby intersection. Delaney followed Solomon. Solomon suddenly looked to her right, and at that point, Maxwell emerged from behind a group of bushes. He was dressed all in black, and had a gun drawn. He ran toward Delaney, reached around Hudson, and fired. Delaney pushed Hudson away and tried to retreat, but tripped and fell while running. Maxwell then continued firing bullets into Delaney, who was on the ground, while Hudson stood by, imploring Maxwell to stop. Solomon stood by and did not intervene. Delaney died at the scene. An autopsy found nine bullets inside his body, and wounds to his face, neck, shoulder, arm, chest, back, hand, and foot. A gun matching the description of the one seen earlier in Solomon's purse was found discarded at the scene of the murder. The gun had no live rounds of ammunition left.

Solomon was arrested at the scene. Maxwell fled, but turned himself into police later that day, and admitted to shooting Delaney. Maxwell claimed that he shot Delaney because Delaney was fighting with Solomon, and Maxwell was aware that Delaney had "beat her into a coma before."[3] Maxwell also stated that there were "a bunch of other people there and they started fighting with me too. I got a gun and shot [Delaney]. I was scared and took off running." Maxwell explained that he left the gun he used at the scene.

## II. DOCKET NO. 337905 (MAXWELL)

### A. SUFFICIENCY OF THE EVIDENCE

Maxwell first contends that the evidence was insufficient to support his convictions. While he admits to shooting Delaney, Maxwell contends that the murder was not premeditated; rather, he acted in defense of Solomon. We disagree.

"The test for determining the sufficiency of evidence in a criminal case is whether the evidence, viewed in a light most favorable to the people, would warrant a reasonable juror in finding guilt beyond a reasonable doubt." *People v Nowack*, 462 Mich 392, 399; 614 NW2d 78

---

[3] No evidence was admitted supporting this statement.

-3-

(2000). "The standard of review is deferential: a reviewing court is required to draw all reasonable inferences and make credibility choices in support of the jury verdict." *Id*. at 400. Circumstantial evidence and rational inferences drawn from circumstantial evidence can, alone, be sufficient to support a conviction. *Id*. Thus, "[t]he scope of review is the same whether the evidence is direct or circumstantial." *Id*.

First-degree premeditated murder is defined as "[m]urder perpetrated by means of poison, lying in wait, or any other willful, deliberate, and premeditated killing." MCL 750.316(1)(a). See also *People v Bowman*, 254 Mich App 142, 151; 656 NW2d 835 (2002) ("The elements of first-degree [premeditated] murder are that the defendant killed the victim and that the killing was . . . 'willful, deliberate, and premeditated,' MCL 750.316(1)(a) . . . ."). The prosecution was required to prove that Maxwell "intentionally killed the victim and that the act of killing was premeditated and deliberate." *People v Jackson*, 292 Mich App 583, 588; 808 NW2d 541 (2011) (quotation marks and citation omitted). "Premeditation and deliberation require sufficient time to allow the defendant to take a second look." *Id*. (quotation marks and citation omitted).

Recently, in *People v Oros*, 502 Mich 229, 240-242; 917 NW2d 559 (2018), our Supreme Court explained:

> The Legislature did not explicitly define the meaning of premeditation and deliberation. However, we have recognized the ordinary meaning of the distinct and separate terms as the following: "[t]o premeditate is to think about beforehand; to deliberate is to measure and evaluate the major facets of a choice or problem." *People v Woods*, 416 Mich 581, 599 n 2; 331 NW2d 707 (1982) (quotation marks and citation omitted). While the statute may be clear on its face that premeditation and deliberation are separate elements, a rigid and mechanical application is often difficult because the same facts may tend to establish each element, and they are subjective factors usually incapable of direct proof absent an admission or confession by the defendant. See Cardozo, *What Medicine Can Do for Law, in Law and Literature and Other Essays and Addresses* (New York: Harcourt, Brace & Co, 1931), p 97 ("[O]n the face of the statute the distinction is clear enough. The difficulty arises when we try to discover what is meant by the words deliberate and premeditated."); see also [*People v* ]*Morrin*, 31 Mich App [301,] 331[; 187 NW2d 434 (1971)], citing *People v Wolf*, 95 Mich 625; 55 NW 357 (1893).

> "Since the distinguishing elements of first-degree murder ultimately resolve themselves into questions of fact, minimum standards of proof, if reasonably related to the circumstances which must be proved, will serve to preserve the distinction between first-degree and second-degree murder." *Morrin*, 31 Mich App at 328. "The real focus of first-degree murder jurisprudence in Michigan has been on the kind of evidence which permits an inference of premeditation and deliberation," and that inference may be established "from *all* the facts of the case." *Id*. at 328 (emphasis added). In other words, when considering a sufficiency-of-the-evidence issue, "[t]he question is whether the

-4-

evidence introduced at the trial fairly supports an inference of premeditation and deliberation." *Id*. at 331. [Footnotes omitted.]

There is no dispute that Maxwell killed Delaney, and thus, the only question is whether sufficient evidence of premeditation and deliberation exists. Taking the evidence in a light most favorable to the prosecutor, the direct and circumstantial evidence demonstrates that Solomon was angry with Delaney and was determined to take her children back from him, despite the time of day, and despite the fact that the children were very young and asleep. She told others that she would either get her children back or kill Delaney. Cellular telephone records showed that Solomon and Maxwell were together, traveling to Delaney's home, in the early hours of the morning.

Solomon then initiated a verbal and physical confrontation with Delaney. While Delaney responded by assaulting Solomon, the evidence indicated that he was not armed,[4] and that he only shoved and slapped Solomon. The shooting did not immediately follow this physical assault. Rather, Solomon stated that she was going to have someone kill Delaney. She then spoke to someone using her cellular telephone—presumably Maxwell. She then backed Delaney toward the area where Maxwell was located. Maxwell emerged from a concealed location, weapon drawn, and began firing. In an attempt to escape, Delaney fell to the ground, where Maxwell shot him multiple times, using every bullet in his weapon. On this record, a rational juror could easily conclude that Solomon and Maxwell agreed to travel to Hudson's home and attempt to retrieve the children. If Delaney would not give the children to Solomon, Maxwell would shoot and kill Delaney, as Solomon had threatened earlier that evening. As such, there is clearly evidence sufficient to support premeditation and deliberation by Maxwell before he shot and killed Delaney.

A person may use deadly force if necessary to prevent being killed or suffering serious bodily harm if they have an honest and reasonable belief that they are in imminent danger of being killed or seriously harmed. *People v Dupree*, 486 Mich 693, 707; 788 NW2d 399 (2010).

"Once a defendant raises the issue of self-defense [or defense of others] and satisfies the initial burden of producing some evidence from which a jury could conclude that the elements necessary to establish a prima facie defense of self-defense [or defense of others] exists, the prosecution must exclude the possibility of self-defense [or defense of others] beyond a reasonable doubt." *People v Stevens*, 306 Mich App 620, 630; 858 NW2d 98 (2014) (quotation marks and citations omitted).

---

[4] After the shooting, Solomon did indicate to her mother that Delaney had a knife during the incident. However, the evidence found at the scene did not substantiate this claim; no knife was found by police. Nor did any other witness testify to seeing Delaney with a knife during the incident.

There was ample evidence submitted at trial to disprove Maxwell's claim of defense of others. While there was a past history of violence between Solomon and Delaney, the testimony showed that Solomon voluntarily took the children to visit with Delaney at his home the day before the shooting, without any incident. There was ample evidence showing that Solomon was not fearful of Delaney at all. Further, at the moment of the shooting, Solomon was not in any imminent danger. Rather, she was backing away from Delaney, seemingly leading him to his death. After Maxwell emerged from the bushes, Delaney tried to run away, only to fall to the ground after tripping. Maxwell then shot Delaney multiple times as he lay on the ground. When Maxwell killed Delaney, any possible threat to Solomon or anyone else was nonexistent. There was more than sufficient evidence to prove that the killing was not the result of any reasonable fear of imminent death or injury to Solomon.

## B. EVIDENTIARY ERROR

Maxwell contends that the trial court abused its discretion by refusing to admit evidence concerning the reason why Delaney had been absent for a period prior to his death, which the trial court found irrelevant to the case. At the time of his death, Delaney had been recently released from prison and was on parole for convictions of larceny, resisting and obstructing a police officer, and receiving and concealing stolen property. Maxwell argues that the trial court's refusal to allow this evidence was an abuse of discretion, and that the error resulted in violations of his constitutional rights to present a defense and to cross-examine witnesses. We disagree.

Maxwell properly raised his claim of evidentiary error in the trial court, and thus, it is preserved for review. *People v Aldrich*, 246 Mich App 101, 113; 631 NW2d 67 (2001). "Evidentiary decisions are reviewed for an abuse of discretion." *People v Steele*, 283 Mich App 472, 487; 769 NW2d 256 (2009). An abuse of discretion occurs when the trial court reaches an outcome outside the range of reasonable and principled outcomes. *People v Solloway*, 316 Mich App 174, 191-192; 891 NW2d 255 (2016).

Maxwell did not, however, claim below that the trial court's decision violated his constitutional rights. Thus, his constitutional claims are not preserved for review. *Id*. at 197. But unpreserved claims of constitutional error are reviewed for plain error affecting substantial rights. *People v Sands*, 261 Mich App 158, 160; 680 NW2d 500 (2004). "In order to avoid forfeiture under a plain-error analysis, defendant must establish (1) that an error occurred, (2) that the error was plain, and (3) that the plain error affected defendant's substantial rights." *People v Kowalski*, 489 Mich 488, 505; 803 NW2d 200 (2011). Even if these elements are satisfied, "reversal is warranted only when the plain, forfeited error resulted in the conviction of an actually innocent defendant or when an error seriously affected the fairness, integrity or public reputation of judicial proceedings independent of the defendant's innocence." *Id*. at 505-506 (quotation marks, brackets, and citations omitted).

Perhaps the most basic rule of evidence is that "[e]vidence which is not relevant is not admissible." MRE 402. Relevant evidence is defined as "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." MRE 401. Maxwell notes that the trial

court allowed evidence of the history of violence between Delaney and Solomon to be admitted. But Maxwell contends that he should also have been allowed to admit evidence of Delaney's recent release from prison because this evidence would have explained why Solomon feared the children being with Delaney for a lengthy period. According to Maxwell, the jury was left with the impression that Solomon was acting unreasonably in seeking the return of her children. He posits that the evidence would have "placed in proper context Solomon's actions in going to get the children and the help she needed from Mr. Maxwell." Maxwell goes on to explain that the prosecutor painted the situation as a revenge killing, and that this was a false narrative; Maxwell believes evidence that Delaney was on parole would have allowed the jury to view the killing as a spur-of-the-moment reaction by Maxwell after seeing Solomon being assaulted.

We fail to see the connections made by Maxwell. Maxwell never explains how the evidence would have shown that Solomon feared her children being with Delaney. The convictions for which Delaney was incarcerated and paroled do not appear to have any connection to Solomon. Precisely how these convictions and the penalties imposed on Delaney would show why Solomon feared Delaney is not at all clear. But beside that missing link, there was no evidence that Solomon actually did fear leaving her children with Delaney. Rather, the record was clear that Solomon *voluntarily* brought the children to Delaney's home for a visit, as she had a few days before. In the end, Maxwell's argument seems to be that he should have been allowed to present evidence that he believes demonstrates why Solomon was afraid of her children being with Delaney. Yet the record shows that no such fear existed in the first instance. Rather, the record demonstrated that Solomon was, at least until the two began to argue late in the evening of June 21, 2016, entirely comfortable with leaving her children with Delaney.

And in any event, precisely why Solomon wanted her children back was not particularly relevant to Maxwell's case. Rather, given that Maxwell had admitted to shooting and killing Delaney, the relevant questions pertained to his state of mind at the time of the shooting. The jury had to determine whether the shooting was premeditated, or merely intentional, and further, whether Maxwell was acting in self-defense or in defense of others. In his closing argument, Maxwell's counsel largely argued that Maxwell killed Delaney because Solomon was afraid that Delaney was planning to take the children out of state. Counsel contended that this was sufficient to show that Maxwell was acting in defense of others. It is difficult to understand how Delaney's imprisonment and parole status would have been of much relevance to the argument. But in any event, the argument itself was entirely irrelevant to the case. In order to use deadly force in defense of another, one must have an honest and reasonable belief that deadly force is necessary "to prevent the imminent death of or imminent great bodily harm to" the other individual. MCL 780.972(1)(a). Maxwell's argument had no bearing on what was required to avoid a conviction, as it failed to demonstrate any fear of imminent death or great bodily harm.

A portion of Maxwell's argument might be read as indicating that the evidence of Delaney's prison and parole status may have shown his aggressive nature, which would, in turn, be relevant to determining whether Maxwell would have been justified in believing that Solomon was at risk of death or great bodily harm. See *People v Harris*, 458 Mich 310, 316-317; 583 NW2d 680 (1998) ("[W]here a defendant charged with murder asserts that he killed in self-defense, his state of mind at the time of the act is material because it is an important element in determining his justification for his belief in an impending attack by the deceased."). As this

Court explained in *People v Orlewicz*, 293 Mich App 96, 104; 809 NW2d 194 (2011), remanded in part on other grounds 493 Mich 916 (2012):

> Evidence concerning the aggressive character of a homicide victim, even if the defendant was unaware of it at the time, is admissible in furtherance of a self-defense claim to prove that the victim was the probable aggressor. MRE 404(a)(2); *People v Harris*, 458 Mich 310, 315-316; 583 NW2d 680 (1998). However, this type of character evidence may only be admitted in the form of reputation testimony, not by testimony regarding specific instances of conduct unless the testimony regarding those instances is independently admissible for some other reason or where character is an essential element of a claim or defense. MRE 405; *Harris*, 458 Mich at 318-319.

Maxwell fails entirely to address this rule, or explain how the evidence sought to be admitted, which is clearly not reputation evidence, would meet any exception to the general rule stated above. This Court has no duty to rationalize Maxwell's claims or elaborate on his arguments for him. *People v Waclawski*, 286 Mich App 634, 679; 780 NW2d 321 (2009). Further, as our Supreme Court explained in *Harris*, because such evidence is relevant to the question of the killer's state of mind, "it is obvious that the victim's character, as affecting the defendant's apprehensions, must have become known to him, otherwise it is irrelevant." *Harris*, 458 Mich at 317. Even if the rule of *Orlewicz* was satisfied, Maxwell fails to point to any evidence that he was aware of Delaney's recent release and parole status at the time of the murder, and thus, fails to demonstrate relevancy. On the whole, we cannot conclude that the trial court abused its discretion by refusing to admit evidence concerning Delaney's recent release from prison and his parole status.[5]

To the extent Maxwell argues that the trial court's evidentiary ruling violated his right to cross-examine witnesses, his argument is clearly without merit. The right to cross-examine witnesses does not encompass a right to cross-examine a witness regarding irrelevant issues. *People v Gaines*, 306 Mich App 289, 316; 856 NW2d 222 (2014). And to the extent Maxwell believes he was denied the right to present a defense, he was not. As explained, the evidence was simply not relevant to Maxwell's defense. Further, while criminal defendants have the constitutional right to present a defense, they must still comply with the rules of evidence. *People v King*, 297 Mich App 465, 473-474; 824 NW2d 258 (2012). "The Michigan Rules of

---

[5] Maxwell also argues that the evidence could have helped rebut an argument by the prosecutor to the effect that Delaney had never taken the children from Solomon in the past. Maxwell explains that this argument was misleading because Delaney was in prison, and thus, could not have taken the children. The trial court did allow the parties to introduce evidence that Delaney had been absent for a period; it did not allow evidence of the reason for that absence. The crucial fact with regard to Maxwell's point is not that Delaney was in prison, but that he was absent and thus did not have the opportunity to take the children. This point could be made from the evidence allowed at trial.

Evidence do not infringe on a defendant's constitutional right to present a defense unless they are arbitrary or disproportionate to the purposes they are designed to serve." *Id*. at 474 (quotation marks and citations omitted). Maxwell fails to explain how the rules regarding the inadmissibility of irrelevant evidence, or the definition of irrelevant evidence, are arbitrary or disproportionate.

### III. DOCKET NO. 342169

### A. SELF-DEFENSE INSTRUCTION

Solomon's first argument on appeal is that the trial court erred with respect to its instructions regarding self-defense and defense of others that were provided to her jury, including a clarifying instruction given immediately before the jury was excused to deliberate. We disagree.

Unlike Delaney's jury, who heard only the version of the shooting so far discussed, Solomon's jury heard essentially two versions of the shooting. Most witnesses testified that after Solomon made a call from her cellular telephone, Maxwell emerged from a concealed location and began shooting. The alternate version of the events came from Lashonda Bush, a neighbor. She testified that Maxwell and Delaney had a physical altercation, and that Delaney was seemingly prevailing. Solomon then reached into her purse and handed Maxwell a handgun, which Maxwell then used to shoot and kill Delaney.[6]

Solomon's counsel asked that her jury be instructed regarding self-defense and defense of others. The prosecutor did not believe that the facts showed that Solomon could have acted in self-defense or defense of others, but agreed that it could be helpful for the jury to hear such instructions—so long as the jury was also instructed that the defenses did not apply to Solomon. Focusing on Bush's testimony, Solomon's counsel argued that there was evidence supporting the instructions. From Bush's testimony, the jury could have concluded that Solomon gave Maxwell the gun because "he's getting his butt whooped and she's doing that to help him out." The trial court agreed to give the instructions to the jury.

When instructing Solomon's jury, the trial court explained the defenses of self-defense and defense of others. But in doing so, the trial court referred solely to Solomon, using feminine pronouns. In other words, the trial court instructed the jury to consider whether Solomon, not Maxwell, acted in self-defense or in defense of another. After finishing the instructions, a short bench conference was held. After this conference, the following occurred:

---

[6] Bush was not available to testify at trial because of a recent health issue. The trial court allowed her testimony provided at Solomon's preliminary examination to be read into evidence at trial. But because Bush only testified at Solomon's preliminary examination, Maxwell's jury was excused and did not hear Bush's testimony.

*The Court*: Just so everyone knows, I – just so you're clear, I read you an instruction with regards to self-defense. The self-defense 7.21 instruction applies only to the defendant Maxwell. Okay? That's – are the People satisfied with the preliminary instructions – with the final instructions?

*Ms. Rubio (The Prosecutor)*: Yes, your Honor.

*The Court*: Ms. Mannarino?

*Ms. Mannarino (Solomon's Counsel)*: I think that's sufficient.

*The Court*: Okay. Thank you.

Solomon filed a motion for a new trial. One argument raised in the motion was that the trial court's instructions regarding self-defense and defense of others were inadequate. The trial court found that the issue was waived by counsel's approval of the instructions. The trial court also evaluated the claim for plain error, and found none; the trial court explained that it had instructed Solomon's jury that if Maxwell acted in self-defense or in defense of another, Solomon could not be found guilty.

Solomon now argues that the trial court's instructions were inadequate because the instructions failed to inform the jury that if Maxwell acted in self-defense, Solomon could not be found guilty. Solomon argues that the clarifying instruction given by the trial court after the bench conference was inadequate. Solomon clearly waived the issue. Waiver is the "intentional relinquishment or abandonment of a known right." *Kowalski*, 489 Mich at 503 (quotation marks and citations omitted). As Solomon's counsel clearly and unequivocally expressed satisfaction with the jury instructions, Solomon cannot now claim error on appeal in this regard. *Id*.

Solomon contends that trial counsel was ineffective for waiving the issue. We disagree. Claims of ineffective assistance of counsel present mixed questions of fact and constitutional law. *People v Shaw*, 315 Mich App 668, 671; 892 NW2d 15 (2016). Any factual findings by the trial court are reviewed for clear error, while the ultimate legal issue is reviewed de novo. *Id*. at 671-672. Clear error exists if "this Court is definitely and firmly convinced that the trial court made a mistake." *Id*. at 672.

As this Court recently explained in *People v Foster*, 319 Mich App 365, 390-391; 901 NW2d 127 (2017):

> Under the Sixth Amendment of the United States Constitution, "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to have the Assistance of Counsel for his defence." The right to counsel plays a crucial role in the Sixth Amendment's guarantee of a fair trial by ensuring that the defendant has access to the "skill and knowledge" necessary to respond to the charges against him or her. *Strickland v Washington*, 466 US 668, 685; 104 S Ct 2052; 80 L Ed 2d 674 (1984). "The right to counsel also encompasses the right to the effective

-10-

assistance of counsel." *People v Pubrat*, 451 Mich 589, 594; 548 NW2d 595 (1996). See also *Strickland*, 466 US at 686.

> Under *Strickland*, 466 US at 687, reversal of a conviction is required when "counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment" and the errors prejudiced the defendant. Accordingly, a defendant requesting reversal of an otherwise valid conviction bears the burden of proving that "(1) the performance of his counsel was below an objective standard of reasonableness under prevailing professional norms and (2) a reasonable probability exists that, in the absence of counsel's unprofessional errors, the outcome of the proceedings would have been different." [*People v* ]*Sabin*[ *(On Second Remand)*], 242 Mich App [656,] 659[; 620 NW2d 19 (2000)].

> To prove the first prong, "[t]he defendant must overcome a strong presumption that counsel's assistance constituted sound trial strategy." *People v Stanaway*, 446 Mich 643, 687; 521 NW2d 557 (1994). "This Court does not second-guess counsel on matters of trial strategy, nor does it assess counsel's competence with the benefit of hindsight." *People v Russell*, 297 Mich App 707, 716; 825 NW2d 623 (2012). Moreover, counsel is not ineffective for failing to make a futile motion. *Sabin*, 242 Mich App at 660. [Footnote omitted.]

Solomon's entire analysis regarding whether counsel was effective is as follows:

> Given the fact that the trial judge ruled in favor of Ms. Solomon's counsel and agreed to give the self-defense instruction as it pertained to Maxwell's actions, there was no strategic purpose for agreeing with the trial judge's alleged clarification of the self-defense instruction. If this Court determines that the instructional error was waived, Ms. Solomon did not receive effective assistance and the conviction must be vacated.

We disagree. The trial court instructed the jury that Solomon was being charged on a theory that she aided and abetted Maxwell in the murder. Solomon's jury was informed that Solomon could only be found guilty if (1) someone else committed the underlying crimes; (2) Solomon assisted that person; and (3) Solomon either intended that the crimes be committed, knew that the other person intended to commit the crimes, or understood that the crimes would be the natural and probable result of the crime intended to be committed. Given the proofs at trial, there was no doubt that the only other person Solomon could have aided was Maxwell. There was no doubt that he was the individual who shot and killed Delaney. Thus, in light of the instructions regarding aiding and abetting, the trial court's clarifying instruction, which explained that the self-defense instruction only applied to Maxwell, would have clearly informed the jury of what Solomon now claims the jury was not told: that if Maxwell acted in self-defense, there was no underlying crime, and thus, Solomon could not be found guilty. Counsel is not ineffective for failing to raise a meritless argument. *Foster*, 319 Mich App at 391. Nor has Solomon established prejudice, as the jury was informed of precisely what Solomon claims it was not, and nonetheless returned a guilty verdict. Clearly, the jury did not believe that what

occurred was in any way an act of self-defense or defense of others. Rather, it concluded that what occurred was a premeditated murder. Solomon is not entitled to a new trial.

## B. VOLUNTARY MANSLAUGHTER INSTRUCTION

Solomon also contends that the trial court erred by refusing her request for a voluntary manslaughter instruction. She claims that counsel was ineffective for waiving the issue below. Presuming such an instruction should have been given, the trial court's refusal to do so was clearly harmless, and thus, no relief is warranted. And as is discussed, counsel cannot be deemed ineffective because counsel did not waive the issue.

In a murder case, and if requested, "an instruction for voluntary . . . manslaughter must be given if supported by a rational view of the evidence." *People v Mendoza*, 468 Mich 527, 541; 664 NW2d 685 (2003). Solomon argues that the trial court should have instructed the jury regarding voluntary manslaughter because the evidence could have supported a conclusion that Maxwell acted out of a heat of passion rather than with the premeditated intent to kill Delaney. Even presuming the trial court erred, Solomon would not be entitled to any relief. Instructional errors of this type (i.e., errors involving a failure to instruct on a necessarily included offense) are not grounds for reversal if the error was harmless. *People v Cornell*, 466 Mich 335, 361-366; 646 NW2d 127 (2002). Solomon must "demonstrate that it is more probable than not that the failure to give the requested lesser included [offense] instruction undermined reliability in the verdict." *Id*. at 364. "The reliability of the verdict is undermined when the evidence clearly supports the lesser included instruction, but the instruction is not given. *Id*. at 365 (quotation marks omitted)." "[I]t is only when there is substantial evidence to support the requested instruction that an appellate court should reverse the conviction." *Id*. And because the "entire cause" must be examined pursuant to MCL 769.26, "in analyzing this question," this Court must "consider what evidence has been offered to support the greater offense." *Id*.

We have some doubts that Solomon could demonstrate that the reliability of the verdict was undermined by the failure to provide a voluntary manslaughter instruction to the jury, given the strong evidentiary support for the prosecutor's theory that this was a premeditated murder. But we need not venture to reach that question because the instructions provided by the trial court and the jury's verdict make it absolutely clear that the failure to provide a manslaughter instruction was harmless. As our Supreme Court explained in *Mendoza*, 468 Mich at 540:

> [B]oth murder and voluntary manslaughter require a death, caused by defendant, with either an intent to kill, an intent to commit great bodily harm, or an intent to create a very high risk of death or great bodily harm with knowledge that death or great bodily harm was the probable result. However, the element distinguishing murder from manslaughter—malice—is negated by the presence of provocation and heat of passion. . . . Thus, we conclude, the elements of voluntary manslaughter are included in murder, with murder possessing the single additional element of malice.

The malice element is negated when "the direct intent to kill was caused by great provocations sufficient to excite the passions beyond the control of reason." *People v Reese*, 491 Mich 127,

152; 815 NW2d 85 (2012) (quotation marks and citation omitted). Thus, "[v]oluntary manslaughter is an intentional killing committed under the influence of passion or hot blood produced by adequate provocation and before a reasonable time has passed for the blood to cool." *People v Hess*, 214 Mich App 33, 38; 543 NW2d 332 (1995).

The trial court instructed Solomon's jury on the elements of first-degree premeditated murder, but also on the elements of second-degree murder, MCL 750.317. The difference between these two crimes is that while both encompass an intentional killing, first-degree murder required, at least in this case, the additional finding that the murder was premeditated. See *People v Carter*, 395 Mich 434, 437; 236 NW2d 500 (1975) ("[S]econd-degree murder is first-degree murder minus premeditation or [an] enumerated felony."). The jury clearly rejected the premise that the murder was not premeditated by finding that Solomon was guilty of premeditated murder. Logically, then, the jury's verdict eliminates any possibility that had it been instructed on the crime of voluntary manslaughter, it would have convicted Solomon of that crime instead of premeditated murder. The jury had the option to conclude that the murder was not premeditated, but found, beyond a reasonable doubt, that it was. A conclusion that the murder was premeditated is entirely inconsistent with a conclusion that it was committed in a heat of passion. Accordingly, any error was harmless and would not warrant reversal. See *People v Wilson*, 265 Mich App 386, 395-396; 695 NW2d 351 (2005) (where the jury is instructed on an intermediate offense and rejected it in favor of the greater offense, a failure to instruct on a lesser offense is harmless); *People v Sullivan*, 231 Mich App 510, 520; 586 NW2d 578 (1998), aff'd 461 Mich 992 (2000) ("[W]here a defendant is convicted of first-degree murder, and the jury rejects other lesser included offenses, the failure to instruct on voluntary manslaughter is harmless.").

We note that the trial court did seem to err with respect to Solomon's argument when addressing her motion for a new trial. The trial court concluded that the issue was waived because Solomon's counsel expressed agreement with the trial court's instructions. While counsel did express satisfaction with the instructions, prior to expressing this agreement, Solomon clearly asked the trial court to instruct the jury on the elements of voluntary manslaughter, and was rebuffed. Under such circumstances, we cannot see how the issue could be deemed waived by counsel. Rather, it would seem apparent that counsel's approval of the instructions was given with the understanding that her request for a voluntary manslaughter instruction had been denied, and thus, there was no reason to raise it a second time. This understanding of what occurred, however, renders Solomon's related ineffective assistance argument without merit. Solomon claims that counsel was ineffective for waiving the issue. Counsel did not waive the issue; rather, counsel pursued the issue, but ultimately failed to persuade the trial court to give the instruction. Solomon's ineffective assistance of counsel claim is based on a false premise, and thus, lacks any conceivable merit.

## C. GREAT WEIGHT OF THE EVIDENCE

Finally, Solomon contends that her conviction was against the great weight of the evidence. We disagree. The test to apply in evaluating a great-weight claim is whether the "evidence preponderates so heavily against the verdict that it would be a miscarriage of justice to allow the verdict to stand." *People v Anderson*, 322 Mich App 622, 632; 912 NW2d 607 (2018).

Conflicting testimony, even if impeached, is not a sufficient ground to grant a new trial. *Id*. Only testimony impeached to the point that it was deprived of all probative value, or which contradicts indisputable physical evidence or physical realities, is sufficient to warrant a new trial. *Id*. Otherwise, credibility determinations are properly left to the jury. *Id*.

Solomon begins by arguing that Bush should not be believed because she was unavailable to testify at trial and only her preliminary examination testimony was admitted. Solomon also argues that Delaney's mother and sisters would have been biased, given that they were family members, and similarly should be ignored. Whether to believe any or all of these witnesses was a matter left to the jury. Solomon provides nothing showing that the testimony of any of these witnesses was so far impeached or patently implausible that it could not be believed by the jury. Accordingly, her credibility arguments fail to show any reason why the verdict should be set aside. *Id*.

Solomon further argues that there was simply no evidence showing that she aided and abetted Maxwell in his commission of the murder. Solomon is incorrect.

> To support a finding that a defendant aided and abetted a crime, the prosecution must show that (1) the crime charged was committed by the defendant or some other person, (2) the defendant performed acts or gave encouragement that assisted the commission of the crime, and (3) the defendant intended the commission of the crime or had knowledge that the principal intended its commission at the time he gave aid and encouragement. [*People v Bosca*, 310 Mich App 1, 21; 871 NW2d 307 (2015), app held in abeyance 872 NW2d 492 (Mich, 2015), app held in abeyance 911 NW2d 465 (Mich, 2018) (quotation omitted).]

In this case, for the reasons discussed in Section II(A) of this opinion, there is clearly evidence indicating that Maxwell committed first-degree premeditated murder. As for the second element of an aiding-and-abetting theory, the evidentiary record showed that before Delaney was murdered, Solomon was angry with him and had threatened to take his life if he would not give her the children. She was seeking someone to drive her to Hudson's home, where Delaney was staying. Evidence of cellular telephone use indicates that Maxwell and Solomon traveled to the home together. Solomon then engaged in an argument with Delaney. She threatened to have someone shoot Delaney. She then used her cellular telephone to speak with someone, and telephone records showed that this person was likely Maxwell. According to one group of witnesses, shortly after this call was made, Maxwell emerged from a hidden location, gun drawn, and fired at Delaney. When Delaney fell to the ground, Maxwell stood over him and emptied his weapon into Delaney. According to another witness, Solomon actually handed the gun to Maxwell, who then shot and killed Delaney. Solomon did nothing to stop the assault, even though the victim was the father of three of her children. She also appeared relatively unaffected by the shooting.

From these facts, it would be fairly simple for a juror to ascertain that Solomon and Maxwell planned to shoot Delaney if he refused to give Solomon the children. And once Delaney indeed refused, Solomon called Maxwell and directed him to kill Delaney. Maxwell

-14-

followed through on this command. If the jury believed that Solomon handed the gun to Maxwell as the events unfolded, then she clearly assisted in the commission of the murder. And regardless of whether Solomon provided the gun to Delaney at the scene, evidence indicated that she was the source of the weapon, as the gun used in the shooting matched one possessed by Solomon earlier in the day. In either event, there was ample evidence showing that Solomon encouraged Maxwell to kill Delaney, and that she intended for Delaney to be killed if he refused to return the children. While the jury would certainly be called on to make some inferences from the circumstances with which it was presented, circumstantial evidence and rational inferences drawn from that evidence can, alone, be sufficient to support a conviction. *Nowack*, 462 Mich at 400. Indeed, when the issue is one of a defendant's state of mind, minimal circumstantial evidence is enough. *People v Ericksen*, 288 Mich App 192, 197; 793 NW2d 120 (2010). The verdict was not against the great weight of the evidence.

Affirmed.

/s/ Michael J. Kelly
/s/ David H. Sawyer
/s/ Jane E. Markey